**19**

LEONARD K. WELSH, CSB No. 097954
LAW OFFICES OF LEONARD K. WELSH
4550 California Avenue, Second Floor
Bakersfield, California 93309
Telephone: (661) 328-5328
Email: lwelsh@lkwelshlaw.com
Attorney for Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>TEMBLOR PETROLEUM COMPANY, LLC<br><br>Debtor-in-Possession. | Case No. 20-11367-A-11<br>Chapter 11<br>DC No. LKW-13<br><br>Date: January 7, 2021<br>Time: 10:30 a.m.<br>Place: United States Courthouse<br>510-19th Street<br>Bakersfield, CA<br>Judge: Honorable Jennifer E. Niemann |

### DEBTOR'S DISCLOSURE STATEMENT DATED NOVEMBER 24, 2020

#### I.

#### Introduction

Temblor Petroleum Company, LLC ("Debtor") filed a Voluntary Petition Under Chapter 11 on April 9, 2020 ("the Petition Date"). Debtor has operated its business as a debtor-in-possession since the Petition Date and a trustee has not been sought or appointed in Debtor's case.

#### II.

#### Purpose of the Disclosure Statement

This Debtor's Disclosure Statement Dated November 24, 2020 ("the Disclosure Statement"):

- describes Debtor and significant events during the bankruptcy case,
- describes the classification and treatment of Claims or equity interests as provided in Debtor's Plan of Liquidation ("the Plan"),

1

- explains how Debtor will execute the Plan,
- explains how Claims will be treated and paid,
- explains who can vote on or object to the Plan,
- explains what factors the Bankruptcy Court ("the Court") will consider when deciding whether to confirm the Plan,
- explains why Debtor believes the Plan is feasible and how the treatment of your Claim or equity interest under the Plan compares to what you would receive on your Claim or equity interest in a case filed under Chapter 7 of the Bankruptcy Code, and
- explains the effects of Confirmation of the Plan.

The Plan will establish your rights with respect to your Claim if the Plan is confirmed. The information contained in the Disclosure Statement is provided to the holders of Claims for the purpose of providing adequate information to Claimants so that Claimants can arrive at an informed decision in exercising their right to accept or reject the Plan.

Your vote to accept or reject the Plan is important. The Plan can be confirmed if it is accepted by the holders of Claims in each Class of Claims voting on the Plan. Additionally, the Court can confirm the Plan if it finds that the Plan accords fair and equitable treatment to the Class rejecting it if the requisite acceptances are not obtained. Debtor will seek Confirmation of the Plan whether the Plan is accepted by all Classes of Creditors or not.

EVERY ATTEMPT HAS BEEN MADE TO PROVIDE ACCURATE INFORMATION IN THIS STATEMENT. HOWEVER, THE INFORMATION HAS NOT BEEN THE SUBJECT OF A CERTIFIED AUDIT. NO REPRESENTATIONS ARE AUTHORIZED BY DEBTOR EXCEPT AS SET FORTH IN THIS STATEMENT. THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT COMES FROM DEBTOR AND ITS ATTORNEYS. PHILIP F. BELL IS THE PRIMARY SOURCE OF INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT AND REPRESENTS

THE BEST SOURCE OF INFORMATION CONCERNING DEBTOR AND ITS ASSETS AND LIABILITIES. TO THE EXTENT THAT INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCONSISTENT WITH INFORMATION CONTAINED IN THE PLAN, THE TERMS OF THE PLAN ARE CONTROLLING.

## III.

### Description of Business

1. **History of Debtor and Events Leading to Filing Chapter 11 Case**

Debtor is a limited liability company doing business in the State of California. Debtor's principal place of business is located in Bakersfield, California. Debtor began it business in May 1996. Debtor has over one hundred members and Debtor's Managing Member is Philip F. Bell. Debtor's business generated gross income of $2,260,980.00 in 2018 and $1,396,240.00 in 2019.

Debtor is an oil and gas exploration company. Debtor has working interests in two producing fields – to wit: (a) the Witter Field located in Fresno County, California ("the Witter Field") and (b) the Lynch Canyon Field located in Monterey County, California ("the Lynch Canyon Field"). Debtor made a discovery at the Witter Field in 2015 where Debtor is the operator and has a forty-nine percent working interest. Over the past three years, Debtor and its partners have permitted and built a full production facility, a gas pipeline and processing plant, and drilled four wells at the Witter Field. Toward the end of this process, a twenty-five percent working interest partner withdrew from the project and an anticipated capital infusion did not occur. Additionally, the initial production at the Witter Field was less than projected which led to losses during the startup period. This lack of cash flow and capital made it impossible for Debtor to pay all of its debt owed to vendors and other creditors.

Debtor attempted to sell its interest in the Lynch Canyon Field in 2019 in order to resolve its debtor-creditor problems and Debtor received an offer to purchase the interest for about $4 million. However, the sale fell through when oil prices crashed in early 2020 and the buyer could not obtain financing. Debtor decided to file its Chapter 11 case after determining that it could not resolve its debtor-creditor problems without the relief provided in the bankruptcy law.

IV.

**Debtor's Historical, Post-Petition, and Projected Financial Information**

**1.     Historical Financial Information**

Debtor has conducted its business since its inception in 1996. Debtor acquired assets in its business including working interests in five oilfields – i.e. (a) the Witter Field, (b) the Lynch Canyon Field, (c) the Los Alamos Field, (d) the Lander Avenue Project, and (e) the Hangman Hollow Field ("the Oilfields"). The working interests had a value of $5,323,016.00 when Debtor filed its Chapter 11 case according to Debtor's Schedules of Assets and Liabilities on file herein. Debtor incurred secured and unsecured debt before it filed its Chapter 11 case. According to Debtor's Schedules and Proofs of Claim filed in Debtor's case, that debt included (a) secured claims of between $4,321,030.30 and $5,199,230.30 including a disputed claim of between $1,755,000.00 and $2,633.200.00 held by Inproinvest, LLC ("Inproinvest") and (b) general unsecured claims of $9,996,450.69 including insider claims of $3,132,368.73 and a disputed claim of $2,918,274.73 held by California Energy Exchange Corporation ("CEE") according to Debtor's Schedules and Proofs of Claim filed in Debtor's case.

**2.     Post-petition Financial Information**

Debtor has not operated its working interests in the Oilfields since it filed its Chapter 11 case because of depressed oil and gas prices caused in part by the Coronavirus pandemic and

Debtor being undercapitalized. Debtor had cash receipts of $43,381.03 and cash disbursements of $39,905.08 from the filing of its Chapter 11 case through October 31, 2020 according to Debtor's Monthly Operating Reports on file herein. Additionally, Debtor had post-petition accounts payable of $190,029.93 as of October 31, 2020 according to Debtor's Monthly Operating Reports.

### 3. **Projected Post-Confirmation Income**

Debtor does not expect to operate its working interests in the Oilfields after confirmation of the Plan and before the sale of its working interests in the Oilfields. However, Debtor expects to sell its working interests in the Oilfields and the machinery and equipment associated with its working interests in the Oilfields during the Term of the Plan. Debtor expects to sell its working interests and machinery and equipment for in excess of $10 million.

## V.

## **Significant Post-Petition Events**

The following significant events have occurred since Debtor filed its Voluntary Petition:

### 1. **Determination of Character of Working Interests in Oilfields**

Debtor filed a Motion for Order to Extend Time for Debtor to Assume or Reject Oil and Gas Leases ("the Motion") as permitted by the law. The Court denied the Motion after finding that Debtor's working interests in the Oilfields are "fee simple determinable" interests and not executory contracts or unexpired leases. This finding by the Court was critical in determining the character of Debtor's interests in the Oilfields and the character of the assets that Debtor can liquidate through the Plan.

2. **Employment of Energy Advisors Group**

Debtor has obtained authorization from the Bankruptcy Court to employ Energy Advisors Group ("EAG") as its marketing and sales agent in connection with the sale of Debtor's working interests in the Oilfields. EAG is a national company and leader in providing negotiated sales and seal-bid packages in the oil and gas industry. Employing EAG as its marketing and sales agent will permit Debtor to sell its working interests in the most efficient and economical way possible.

3. **Employment of Other Professionals**

Debtor has obtained authorization from the Bankruptcy Court to employ:

    a. the Law Offices of Leonard K. Welsh as its general counsel in its Chapter 11 case, and

    b. Brown Armstrong as its accountants in its Chapter 11 case.

4. **Motions for Relief from Automatic Stay**

Debtor has a dispute with CEE concerning the validity and amount of CEE's claims against Debtor and Debtor's claims against CEE. Debtor and CEE reached an agreement in Debtor's Chapter 11 case under which CEE would be granted limited relief from the automatic stay so that the Sacramento County Superior Court can determine the validity and amounts of CEE's claims against Debtor and Debtor's clams against CEE. Any claim against Debtor found in favor of CEE by the Sacramento County Superior Court will be treated as a Class Five claim under the Plan.

5. **Appointment of Committee of Unsecured Creditors**

The United States Trustee has not appointed a Committee of Unsecured Creditors in Debtor's case.

**6. Motion to Dismiss or Convert Chapter 11 Case or Appoint a Chapter 11 Trustee**

There have been no Motions to Dismiss or Convert Chapter 11 Case to Chapter 7 or Motions to Appoint a Chapter 11 Trustee filed in Debtor's case. Debtor does not believe that grounds exist for the granting of any such Motions.

**7. Administrative Matters**

Debtor has filed its Monthly Operating Reports and paid the Quarterly Fees owed to the United States Trustee as required by the law since it filed its Chapter 11 case.

**8. Disclosure Statement and Plan of Reorganization**

Debtor has filed a Plan of Liquidation and Disclosure Statement Dated November 24, 2020. A hearing for approval of the Disclosure Statement is set for January 7, 2021. The Bankruptcy Court will determine at that time if the Disclosure Statement contains "adequate information" as required by 11 USC Section 1125.

## VI.

## Legal Proceedings

Debtor was the party to four lawsuits before it filed its Chapter 11 case. The lawsuits were collection actions filed against Debtor by (a) Commercial Trade in the Kern County Superior Court, (b) Redline Directional Services in the Fresno County Superior Court, (c) Patriot Environmental Services in the Los Angeles County Superior Court, and (d) Key Energy Services in the Harris County, Texas Judicial District Court. All of the lawsuits filed against Debtor have been stayed by Debtor's Chapter 11 case and the Plaintiff's claims in the lawsuits will be treated and allowed as claims in the Plan.

# VII.

## Financial Information

1. **Liabilities as of the Petition Date and Effective Date**

   a. **Creditors Having Administrative Claims**

   Debtor has incurred Administrative Claims since the filing of its Voluntary Petition. The Administrative Claims include post-petition accounts payable and professional fees. Debtor estimates fees owed to professionals on the Effective Date of the Plan will be:

   | Name | Amount |
   | --- | --- |
   | Law Offices of Leonard K. Welsh | $ 25,000.00 |
   | Brown Armstrong | $  5,000.00 |

   Any unpaid professional fees will be paid after Court approval if Court approval is required. Debtor expects its Members to pay the fees owed to its professionals on the Effective Date of the Plan. Debtor's post-petition accounts payable will be paid from the collection of Debtor's accounts receivable. Debtor expects its post-petition accounts payable to be about $250,000.00 on the Effective Date of the Plan.

   b. **Creditors Holding Security**

   Debtor has Secured Claims totaling between $4,321,030.30 and $5,215,153.53 according to Debtor's <u>Amended Schedule D: Creditors Who Have Claims Secured by Property</u> and Proofs of Claim filed by creditors in Debtor's case. Debtor has made no payments to secured creditors and has not reduced the debt owed to its secured creditors since it filed its Chapter 11 case.

   Debtor believes that the Allowed Secured Claims will be about $3,038,982.00 on the Effective Date of the Plan after Inproinvest's claim is reduced from between $1,755,000.00 and $2,633,200.00 to $303,982.00 or ten percent of proceeds received from the sale of Debtor's interest in the Witter Field and the machinery and equipment associated with the Witter Field.

c. <u>Unsecured Claims with Priority</u>

Debtor has Priority Unsecured Claims of $10,316.91 according to the Proofs of Claim filed in Debtor's case.

Debtor the will be Allowed Priority Unsecured Claims will be $10,316.91 on the Effective Date of the Plan.

d. <u>Unsecured Claims Without Priority</u>

Debtor has Non-priority Unsecured Claims of $17,229,636.52 according to its <u>Schedule E/F: Creditors Who Have Unsecured Claims – Part 2.</u> See *Schedule E/F: Creditors Who Have Unsecured Claims – Part 2* and Proofs of Claim filed in Debtor's case. Debtor's general unsecured claims include insider claims of $3,132,368.73 and a disputed claim of $7,604,207.68 asserted by CEE.

e. <u>Disputed Claims</u>

CEE has filed a Proof of Claim for $7,604,207.68. CEE's claim is filed as a general unsecured claim. Debtor disputes the validity and amount of CEE's claim provided in the creditor's Proof of Claim. The validity and amount of CEE's claim will be determined by the Sacramento County Superior Court in litigation pending in the State Court or an agreement between the parties. CEE's disputed claim is included in the Plan as the Class Six claim and will remain separately classified until the claim is liquidated by the Sacramento County Superior Court or an agreement between the parties. The amount of CEE's claim as determined by the Sacramento County Superior Court or a settlement between the parties will be allowed as a Class Five claim.

Inproinvest has filed a Proof of Claim for bertween $1,755,000.00 and $2,633,200.00. Inproinvest's claim is filed as a secured claim. Debtor disputes the amount of Inproinvest's claim for the reasons given in Section 3.03 of the Plan. Inproinvest's Allowed Claim will be

ten percent of the proceeds received by Debtor from the sale of its interest in the Witter Field and the machinery and equipment associated with the Witter Field. Debtor believes that Inproinvest's Allowed Claim will be about $303,982.00.

Debtor does not dispute any of the claims listed in its Schedules of Assets and Liabilities except for CEE's claim and Inproinvest's claim.

    f.    Allowance of Claims

Any claim not objected to by Debtor or another party in interest will be an Allowed Claim in (a) the amount set forth in a Proof of Claim filed by or for a creditor or (b) scheduled by Debtor. However, nothing contained in the Disclosure Statement will be deemed to be a determination of the amount or allowance of a Claim.

The Plan provides that there will be no fixed date for Debtor to object to the allowance of any Claims except Class Five general unsecured claims. The Plan sets (a) sixty days after the Effective Date of the Plan or (b) sixty days after the filing of an amended claim whichever is later as the deadline for Debtor to object to the allowance of a general unsecured claim. See *Plan of Liquidation*, Section 9.4 at Page 14.

2.    Assets

    a.    Real Property

Debtor owns fee simple determinable interests in the Oilfields as indicated above. Debtor believes that its interests in the Oilfields have a value of $5,323,016.00. *See Schedule A/B: Assets – Real and Personal Property* filed by Debtor on April 25, 2017.

    b.    Personal Property

Debtor reported personal property valued at $7,365,350.15 on its *Amended Schedule A/B: Assets – Real and Personal Property*. *See Schedule A/B: Assets – Real and Personal Property* filed by Debtor on May 27, 2020. Debtor's personal property includes (1) money on deposit, (2) account receivables, and (3) machinery and equipment. The value of Debtor's

machinery and equipment listed in Schedule A/B represented the market value of the assets when Debtor filed its Chapter 11 case. Debtor believes that the market value of its machinery and equipment is $5,223,706.57 at the present time. Debtor believes that the liquidation value of its machinery and equipment may be less than the market value of those assets.

Debtor's Schedule A/B included accounts receivable of $2,010,834.51 owed to Debtor when Debtor filed its Chapter 11 case; while, Debtor's Monthly Operating Report for October 2020 indicates that Debtor's accounts receivable remain $2,010,834.51 as of October 31, 2020. Debtor believes that most of its accounts receivable are collectible.

## VIII.
## Tax Attributes

Debtor is an S Corporation for income tax purposes. Debtor has tax attributes including depreciable assets. However, Debtor will not incur income tax liability during the term of the Plan because it is an S Corporation for income tax purposes.

## IX.
## Preference and/or Avoidance Claims

Debtor does not believe that there is a basis for bringing any preference and/or avoidance claims in its Chapter 11 case. This is true because Debtor believes that:

    a.    there were no material transfers of property outside of the ordinary course of business before Debtor filed its Chapter 11 case, and

    b.    it received fair market value in exchange for any property transferred in the ordinary course of business before it filed its Chapter 11 case.

## X.
## Summary of the Plan of Liquidation

**1.　　Generally**

Debtor will liquidate all of its assets through the Plan and use proceeds received from the sale of those assets to satisfy all allowed claims to the maximum extent possible. Debtor

will sell its working interests in the Oilfields and its machinery and equipment through EAG. Debtor will collect the accounts receivable owed to it as expeditiously as possible and use proceeds received from the sale of its assets and collection of its accounts receivable to satisfy allowed claims in the priority set by the law. A projection of the amount of money that Debtor expects to receive from the sale of its assets and collection of its accounts receivable and Debtor's payments to be made under the Plan is included in the <u>Exhibits to Debtor's Disclosure Statement Dated November 24, 2020</u> ("the Exhibits") on file herein as Exhibit "A".

### 2. General Treatment of Classes of Claims

The Plan includes ten Classes of Claims and Interests including:

    a. one Class of priority unsecured claims (Class One),

    b. three Classes of secured claims (Class Two, Class Three, and Class Four),

    c. one Class of general unsecured claims (Classes Five),

    d. one Class of disputed claims (Class Six),

    e. one Class for general unsecured claims held by Debtor's Insiders (Class Seven),

    f. one Class for Debtor's executory contracts and unexpired leases (Class Eight),

    g. one Class for the interests of Debtor's Members (Class Nine), and

    h. one Class for Debtor's interests (Class Ten)

The Plan provides that secured creditors will retain their liens against Debtor's real assets until their secured claims are paid in full. **The Plan further provides for a pro rata distribution to Class Five General Unsecured Creditors from proceeds received from the sale of Debtor's real and personal property and collection of Debtor's accounts receivable until such claims are paid in full.** Claims held by Debtor's Insiders will be subordinated to the claims held by all other creditors so other creditors can be paid in full before the Insiders are paid anything. Debtor does not know if the liquidation of its real and personal property and collection of its accounts receivable will result in payment in full of all Allowed Claims.

### 3. Debtor's Interests.

The Plan provides that Debtor will liquidate its assets for the benefit of creditors during the Term of the Plan and use proceeds received from the sale of its assets to pay Allowed

Claims in the priority set by law. Confirmation of the Plan will not vest all property of the estate in Debtor as provided in 11 USC Section 1141(b). Property of the estate will vest in Debtor if all Allowed Claims are paid in full. Debtor's assets shall remain in the bankruptcy estate if Debtor's case is converted to Chapter 7 at any time after confirmation of the Plan and before the Court enters a Final Decree.

## XI.

### Cash Requirements and Administrative Expenses

Debtor may not have money in the Chapter 11 estate on the Effective Date of the Plan to pay Administrative Expenses and post-petition accounts payable as required by the law. The Plan provides for payment of $50,000.00 in post-confirmation professional fees by Debtor. These fees include fees incurred by Debtor's General Counsel and Litigation Counsel associated with Debtor's dispute with CEE. Debtor's Members will pay the fees and costs owed to its attorneys and accountants after such payments have been authorized by the Bankruptcy Court if Debtor cannot pay the fees and costs. Debtor intends to pay its post-petition accounts payable in full from the collection of its accounts receivable.

## XII.

### Confirmation Requirements and Procedures

The Plan must meet the requirements listed in 11 USC Sections 1129(a) or (b) to be confirmable. These include the requirements that (a) the Plan must be proposed in good faith, (b) at least one impaired class of claims must accept the plan without counting votes of insiders, (c) the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a Chapter 7 liquidation case unless the creditor or equity interest holder votes to accept the Plan, and (d) the Plan must be feasible. However, these requirements are not the only requirements listed in 11 USC Section 1129 and they are not the only requirements for confirmation. Debtor will request confirmation under 11 USC Sections 1129(a) or (b).

### 1. Who May Vote or Object?

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Some parties in interest are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder can vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both allowed or allowed for voting purposes and impaired. Debtor believes there are seven classes of claims that are impaired under the Plan.

### 2. What Is an Allowed Claim or an Allowed Equity Interest

Only a creditor or equity interest holder with an Allowed Claim or an allowed equity interest can vote on the Plan. A Claim or equity interest is allowed if (a) Debtor has scheduled the claim on Debtor's Schedules unless the Claim has been scheduled as disputed, contingent, or unliquidated, or (b) the creditor has filed a Proof of Claim or equity interest unless an objection has been filed to such Proof of Claim or equity interest. When a Claim or equity interest is not allowed, the creditor or equity interest holder holding the Claim or equity interest cannot vote unless the Court overrules the objection or allows the Claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

*The deadline for filing a Proof of Claim for non-governmental agencies in this case was September 21, 2020.*

*The deadline for filing a Proof of Claim for governmental agencies in this case was October 6, 2020.*

### 3. What Is an Impaired Claim or Impaired Equity Interest?

The holder of an Allowed Claim or equity interest has the right to vote only if it is in a Class that is *impaired* under the Plan. As provided in 11 USC Section 1124, a Class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class.

### 4. Who is Not Entitled to Vote?

The holders of the following types of Claims and equity interests are *not* entitled to vote:
- holders of Claims and equity interests that have been disallowed by an order of the Court;

- holders of other Claims or equity interests that are not "Allowed Claims" or "allowed equity interests" unless they have been "allowed" for voting purposes;
- holders of Claims or equity interests in unimpaired classes;
- holders of Claims entitled to priority pursuant to 11 USC Sections 507(a)(2), (a)(3), and (a)(8);
- holders of Claims or equity interests in classes that do not receive or retain any value under the Plan; and
- administrative expenses.

*You Have a Right to Object to the Confirmation of the Plan Even If You Are Not Entitled to Vote on the Plan.*

5. **Who Can Vote in More Than One Class?**

A creditor whose Claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity and should cast one ballot for each claim.

6. **Votes Necessary to Confirm the Plan**

The Court cannot confirm the Plan unless (a) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (b) all impaired classes have voted to accept the Plan unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes as discussed in Paragraph b below.

  a. **Votes Necessary for a Class to Accept the Plan**

A class of claims accepts the Plan if both of the following occur: (a) the holders of more than one-half of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (b) the holders of at least two-thirds in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

  b. **Treatment of Non-Accepting Classes**

Even if one or more impaired classes reject the Plan, the Court may confirm the Plan if the non-accepting classes are treated in the manner prescribed by 11 USC Section 1129(b). A plan that binds non-accepting classes is commonly referred to as a "cram down" plan. The

Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of 11USC Section 1129(a)(8), does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

To the extent any Class impaired under the Plan and entitled to vote does not accept the Plan by the requisite statutory majority provided in 11 USC Section 1126(c) as discussed above, or is deemed to have rejected the Plan, Debtor will request confirmation of the Plan under 11 USC Section 1129(b).

### c. Application of the Absolute Priority Rule

In corporate Chapter 11 cases, classes of creditors must consent to their treatment under the Plan or receive payment in full before any junior class of creditors receive anything under the Plan. This is called the "Absolute Priority Rule." Debtor believes that the Absolute Priority Rule may apply in its Chapter 11 case because Debtor is not certain that the liquidation of its assets through the Plan will result in payment on full of all allowed claims. Debtor will seek confirmation of the Plan under the "cram down" provisions of 11 USC Section 1129(b) if the Court determines that the Absolute Priority rule does apply in this case.

## XIII.

## Chapter 7 Comparison and Liquidation Analysis

Unsecured creditors will receive a dividend in Debtor's Chapter 11 case equal to or greater than the dividend that would be available to unsecured creditors in a Chapter 7 case. This is true because the Plan provides for the liquidation of all of Debtor's assets without the administrative costs associated with a Chapter 7 case including Trustee's fees under 11 USC Section 326. Furthermore, Interest will accrue on all allowed general unsecured claims at the rate of three percent per annum from the Effective Date of the Plan until the unsecured claims are paid in full. This may or may not be true in a Chapter 7 case. Finally, the interest provided to general unsecured claims is higher than the Federal Judgment rate of interest and the amount required by the law. See In re Cardelucci, 285 F.3d 1231 (9th Cir. 2002).

## XIV.

### Discharge

Confirmation of the Plan does not discharge any debt provided for in the Plan because (a) the Plan provides for the liquidation of all or substantially all of the property of the estate, (b) Debtor may not engage in business after consummation of the Plan, and (c) Debtor would be denied a discharge in a Chapter 7 case. See 11 USC Sections 1141 (d) (2) and 727 (a).

## XV.

### Management Compensation

Philip F. Bell will manage Debtor's business and financial affairs during the Term of the Plan. Mr. Bell will not be paid any compensation by Debtor during the Term of the Plan for services rendered by Mr. Bell. However, Mr. Bell will have an allowed Class Seven claim for prepetition debt owed to Mr. Bell by Debtor and Mr. Bell will receive payment on his Class Seven claim when other Class Seven claimants are paid under the Plan.

## XVI.

### Insider Claims

Debtor's members have claims against Debtor for debt owed to the members and their families. The insider claims are separately classified and treated and allowed as Class Seven claims under the Plan and will be subordinated to the claims held by other general unsecured creditors.

## XVII.

### Creditor Risks

There is risk to creditors with the confirmation of the Plan. The primary risk to creditors is Debtor's failure to complete the payments required by the Plan. Debtor believes the benefits associated with the Plan outweigh the risks associated with the Plan and that the Plan represents the best chance for all creditors to receive the most payment possible on their Allowed Claims in the shortest period of time possible.

## XVIII.

### Alternatives to the Amended Plan

Dismissal of the case or conversion to Chapter 7 are alternatives available to Debtor if the Plan is not confirmed. Confirmation of the Plan is preferable to the dismissal of Debtor's case because dismissal of the case would result in the forced sale of Debtor's real property interests by secured creditors and unsecured creditors being forced to pursue collection actions against Debtor under state law.

Debtor believes that its debt owed to creditors will be paid faster under the Plan than would be true if Debtor's Chapter 11 case was converted to Chapter 7. This is true because the Term of the Plan is two years and large Chapter 7 cases often take more than two years to administer and payments to be made to creditors. Additionally, the Plan provides that insider claims of $3,132,368.73 owed to Debtor's Members and their families will be subordinate to the claims held by other general unsecured creditors. Such subordination of insider claims would not exist in a Chapter 7 case and means that the Plan is better for all non-insider general unsecured claims than the relief available in a Chapter 7 case. See 11 USC Sections 510 and 726. See also In re Lazar, 83 F. 3d 306 (9th Cir. 1996).

Debtor estimates that the administrative expenses in a Chapter 7 case would exceed $1 million including:

a. a commission of more than $400,000.00 to a liquidating agent,

b. costs of about $300,000.00 to collect Debtor's accounts receivable, and

c. a fee of more than $370,000.00 to the Trustee in a Chapter 7 case.

See 11 USC Sections 326, 327 and 330. Debtor believes that the administrative expenses in its Chapter 11 case will be far less than the administrative expenses that would be incurred in a Chapter 7 case. For that reason, Debtor believes that creditors will receive a greater dividend

through its Chapter 11 case than would be true in a Chapter 7 case and confirmation of the Plan is in the best interest of all parties concerned.

Date: November 24, 2020

TEMBLOR PETROLEUM COMPANY, LLC

By /s/ Philip F. Bell
PHILIP F. BELL
Managing Member

**APPROVED:**

LAW OFFICES OF LEONARD K. WELSH

By /s/ Leonard K. Welsh
LEONARD K. WELSH
Attorneys for Debtor-in-Possession