

Trio Petroleum LLC
Steven A. Rowlee, Vice President
5401 Business Park South, Suite 115
Bakersfield, CA 93309-0713
(661) 324-3911
rowlee@triopetroleum.com

```
                 FILED
                 MAR 23 2023
         UNITED STATES BANKRUPTCY COURT
           EASTERN DISTRICT OF CALIFORNIA
```

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| In re: | Case No. 20-11367-A-7 |
| Temblor Petroleum Company, LLC, | Chapter 7 |
| | DCN: PRG-1 |
| Debtor. | Declaration of Terence B. Eschner in Support of Trio's Opposition to Motion of Genautica Oil Holdings, LP to Vacate Sale Order, as Amended |
| | Date:    April 6, 2023<br>Time:    10:00 a.m.<br>Place:   US Courthouse<br>         510 19th Street<br>         Bakersfield, CA<br>Judge:   Hon. Jennifer E. Niemann |

I, Terence B. Eschner, declare:

1.  I am a registered professional geologist and through Sarlan Resources, Inc. commonly work as a consultant to Trio Petroleum LLC ("Trio"). Trio is the operator of various oil and gas properties including a property known as the Hangman Hollow Area of the McCool Ranch Oil

Field ("Hangman Hollow") that is located in Monterey County, California. As a consultant to Trio on Hangman Hollow I have worked extensively on matters including but not limited to interpreting technical data (i.e., geological, geophysical, petrophysical and engineering data), obtaining and updating permits for underground injection control ("UIC") projects (note: there are two UIC projects at Hangman Hollow, one of which is UIC Project #64406013 that enables the disposal of waste water via injection into a water disposal well, and the other of which is UIC Project #44800005 that enables the periodic injection of steam into producing oil wells to improve oil recovery), supervision and/or monitoring during some drilling operations, marketing efforts to obtain new investors, and other such similar matters. The facts stated in this declaration are based on my personal knowledge from working as a consultant to Trio on Hangman Hollow since about 2012.

2. In full disclosure, I state that my father, Stanford Eschner, is co-owner of Trio. Neither I nor any of my companies own any interest in Trio, and I am not an employee of Trio.

3. Also in full disclosure, I state that I am not an attorney and my opinions and/or my understanding of the facts as stated herein are not to be deemed as legal opinions.

4. In this Declaration I seek to correct the record regarding certain assertions made in the following three documents that were filed by Genautica Oil Holdings, LP ("Genautica"): 1) the NOTICE OF MOTION AND MOTION OF GENAUTICA OIL HOLDINGS, LP TO VACATE SALE ORDER, AS AMENDED" (the "Motion"); 2) the DECLARATION OF DAN SCHOLEFIELD IN SUPPORT OF THE MOTION OF GENAUTICA OIL HOLDINGS, LP TO VACATE SALE ORDER, AS AMENDED (the "Scholefield Declaration" or "Scholefield Decl."), and; 3) the EXHIBITS TO DECLARATION OF DAN SCHOLEFIELD IN SUPPORT OF MOTION OF GENAUTICA OIL HOLDINGS, LP TO VACATE SALE ORDER, AS AMENDED (the "Exhibits")

5.  In this Declaration I do not seek to correct the record regarding each and every incorrect assertion made by Genautica. Rather, I seek to correct the record on those incorrect assertions that are particularly relevant to the matter at hand, and also those that wrongly impugn Trio's reputation.

6.  Background information. Prior to attempting to correct the record on certain assertions made by Genautica, I provide the following background information, which I believe is relevant to the matter at hand:

7.  Background information. The cash portion of Trio's standing bid was and is $10,000. Temblor Petroleum Company, LLC ("Debtor") has been in arrears at Hangman Hollow since 2018 and currently owes approximately $236,911.44 to Trio for Debtor's 24.443369700% working-interest share of Hangman Hollow expenditures. Thus, Trio's effective total bid is $246,911.44, being comprised of $10,000 cash plus the $236,911.44 in debt that would be absorbed by Trio in the event Trio is the successful bidder.

8.  Background information. I understand that there was a telephone conversation on April 6, 2021, between Mr. Steve Rowlee (Trio's Vice President) and Mr. Leonard K. Welsh (Debtor's bankruptcy attorney) about the Temblor bankruptcy in general, during which time Mr. Welsh commented that he thought since Temblor was now filing Chapter 7 (as opposed to Chapter 11) that Debtor's arrears owed to Trio (i.e., the aforementioned $236,911.44), being that Debtor was an LLC, would transfer to any party acquiring Debtor's working interest ("WI") at Hangman Hollow. Thus, it was concluded by Trio that any acquiring party in its proposed purchase price of Debtor's WI would need to factor in the additional approximate $236,911.44 that would need to be paid to Trio as Operator to bring the acquiring party's account current at Hangman Hollow. Also circa May, 2021, Mr. Jeffrey M. Vetter (Bankruptcy trustee, or "Trustee") advised that attempts to obtain a satisfactory bid for Debtor's WI in Hangman Hollow had been unsuccessful. With this information Trio proposed to Trustee that

Trio be assigned Debtor's WI in exchange for Trio forgiving and thus forfeiting the approximate $236,911.44 owed to Trio by Debtor. During subsequent negotiations between Trio and Trustee it was found mutually acceptable that Debtor's WI be assigned to Trio at a cost to Trio of $246,911.44, being comprised of a Trio $10,000 bid plus the $236,911.44 in debt that would be absorbed by Trio. Trustee and Trio considered this amount (i.e., $246,911.44) to be a very serious and acceptable bid. Trustee advised that he did not expect a bid higher than Trio's in the bankruptcy proceeding, if any competing bid at all.

9. Background information. There appears to be uncertainty and/or a potential dispute as to whether Debtor's approximate $236,911.44 liability to Trio will transfer to any party acquiring Debtor's WI at Hangman Hollow. As noted elsewhere above, Debtor's bankruptcy attorney commented circa April, 2021, that he thought that the burden of Debtor's arrears owed to Trio (i.e., the aforementioned $236,911.44) would transfer to any party acquiring Debtor's WI. Trio believes that the liability should transfer to any acquiring part, consistent with the aforementioned comment made by Debtor's bankruptcy attorney. However, Genautica indicates that it "*disputes the validity of Trio's claims and rights*" in this matter (Scholefield Decl., ¶19). I understand that it is not the responsibility of the Brokers (i.e., Energy Advisors Group), Trustee and/or Debtor to resolve any such dispute and/or to eliminate any uncertainty related thereto. Nevertheless, the original sale motion with the notice of hearing with bidding instructions stipulates "*the sale of the subject property is in "as is" condition, and buyer is subject to any all liens, encumbrances, charges, taxes, fees and delinquencies attributed to the Debtor's share of joint interest liabilities*" (¶ 5.e, page 10 of 15). As discussed further immediately below, Mr. Scholefield and Genautica had plenty of time prior to and after the oral-auction bankruptcy proceeding to do their own due diligence on this matter but did not and, therefore, were unprepared during the oral-auction bankruptcy proceeding. Mr.

Scholefield's and/or Genautica's lack of preparation should not be construed as a basis to reopen the bankruptcy proceedings.

10. Background information. In an email dated July 5, 2022, from Mr. Scholefield to Trustee, Mr. Scholefield asks *"Is the Temblor interest being offered/sold free of liability in the bankruptcy proceeding?"* (page 47 of 49 in Exhibit G in the Exhibits). Subsequently, three months later, during the oral-auction bankruptcy proceeding on October 8, 2022, Mr. Scholefield stated *"Your Honor, we would like to - - we've reached a point, a price point above which we would be willing to bid higher; however, we were not given adequate information about the outstanding liabilities that we're being asked to assume and we'd like to have the balance of that information provided in order to place a higher bid. So we request that that information be provided to us and that the bidding be continued at a later time and in order for us to place a higher bid, but have an understanding of what the outstanding liabilities are"* (page 12-13 of Exhibit A in the Exhibits). The aforementioned email from Mr. Scholefield on July 5, 2022, and the aforementioned comments to the Court three months later on October 8, 2022, clearly indicate that Mr. Scholefield and Genautica did not properly do their own due diligence and, therefore, were unprepared during the oral-auction bankruptcy proceeding. Mr. Scholefield's and/or Genautica's lack of preparation should not be construed as a basis to reopen the bankruptcy proceedings.

11. Background information. In an email dated September 13, 2022, from Trustee to Mr. Scholefield, Trustee advises Genautica that *"as the backup bidder, the offer of genautica oil holdings will be accepted. please remit the balance of your bid ($76,000.00) to the po box below"* (note: sentences all in lowercase as shown, see page 32 of 39 in Exhibit D of the Exhibits). Genautica failed to perform as backup bidder and did not pay the $76,000.00 owed. It appears that Genautica did not perform and therefore did not take assignment of Debtor's WI at least in part because Genautica incorrectly concluded that there were problems with the

permits for the UIC Water Disposal Project #64406013 and/or the UIC Cyclic-Steam Injection

Project #44800005 that would prevent the timely restarting of operations at Hangman Hollow.

As elaborated elsewhere in this Declaration, there are no such problems with the UIC permits

that would prevent the timely restarting of operations at Hangman Hollow. Furthermore, Mr.

Scholefield admits in the Scholefield Declaration that *"In 2021, I was told by Stan Eschner,*

*Trio's chairman, that the Project was ready to go and could start injecting steam and*

*producing oil "tomorrow""*(Scholefield Decl., ¶3). Mr. Scholefield and/or Genautica

apparently chose to disregard the information provided by Mr. Stan Eschner and instead

incorrectly concluded that there were problems with the permits for the UIC projects that would

prevent the timely restarting of operations. Once again, Mr. Scholefield and/or Genautica did

not properly do their own due diligence, which apparently is one of the reasons that Genautica

failed to perform as the backup bidder. Mr. Scholefield's and/or Genautica's failure to properly

do their own due diligence should not be construed as a basis to reopen the bankruptcy

proceedings.

12. Background information. Genautica has been in arrears at Hangman Hollow since 2015

and currently owes approximately $233,219.40 to Trio as Operator for Genautica's 12.22%

working-interest share of Hangman Hollow expenditures. I find the idea troubling that a

company that is in arrears (i.e., Genautica, with arrears of ~ $233,219.40) could acquire the WI

of another company that is similarly in arrears (i.e., Debtor, with arrears of ~ $236,911.44) and

not be burdened by the arrears owed by the acquired company. Furthermore, Genautica and

Debtor have been involved together in various oil and gas deals (e.g., Hangman Hollow

oilfield, Lynch Canyon oilfield, Witter oilfield, Arctic Hunter Energy Inc.) and, although I have

been unable to confirm whether one is a part-owner or a managing member of the other, I find

it troubling that one could acquire the Hangman Hollow WI of the other and not be burdened

by the arrears owed by the acquired company.

13. Background information. The information provided in the following five Paragraphs was, in my opinion, confirmed by CalGEM Engineer Mr. Jon Iverson in a Zoom meeting on February 23, 2023. Also participating in the Zoom meeting were Trio personnel Mr. Stan Eschner, Mr. Steve Rowlee and Mr. Gary Horace.

14. Background information (confirmed in the aforementioned Zoom meeting with CalGEM's Jon Iverson). I understand that Trio may restart producing oil wells at Hangman Hollow at any time without prior notification to CalGEM. If Trio does restart oil production, Trio would need to resume normal monthly reporting to CalGEM of produced fluid volumes (i.e., volumes of oil, gas and water). Subsequently to the restarting of any such producing oil well, there might be testing requirements for previously idled wells, such as fluid level tests and/or tests of mechanical integrity.

15. Background information (confirmed in the aforementioned Zoom meeting with CalGEM's Jon Iverson). I understand that the UIC Water Disposal Project #64406013, which enables water injection into the 'D' Sand and into the Santa Margarita Sand at the San Ardo WD-1 well at Hangman Hollow, is fully-approved and in good standing. The WD-1 well is classified by CalGEM as "idle". Because the WD-1 well is considered idle, Trio will need to notify CalGEM in advance of Trio's intent to reinitiate water disposal at said well. CalGEM will probably reply to the notification by advising that routine mechanical integrity testing is required at said well prior to reinitiating injection. The entire process, from the date of the aforementioned notification from Trio to CalGEM, to the date that water injection may be reinitiated, can probably be accomplished in a matter of weeks (e.g., maybe 2 or 3 weeks). I further understand that: 1) when injection recommences, and according to regulatory protocols, Trio will collect a surface water sample (note: such collection can be accomplished in a single day) at the location of the WD-1 well (i.e., injection water) and obtain a chemical analysis that will be filed with CalGEM; 2) when injection recommences and when sufficient water is

available, Trio will run a step-rate test (note: such step-rate-test can be accomplished in a single day) at the WD-1 well, and; 3) that CalGEM stipulates that the WD-1 well with its current mechanical completion may only accommodate an additional 858,000 barrels of water injection.

16. Background information (confirmed in the aforementioned Zoom meeting with CalGEM's Jon Iverson). I understand that the UIC Cyclic-Steam Project #44800005, which enables cyclic-steam injection into the Lombardi oil sands at six existing oil wells at Hangman Hollow, is fully-approved and in good standing. The six oil wells are classified by CalGEM as "idle". Because the six wells are considered idle, Trio will need to notify CalGEM in advance of Trio's intent to reinitiate cyclic-steam injection into any of said wells. CalGEM will probably reply to the notification by advising that routine mechanical integrity testing is required at said wells prior to reinitiating injection. The entire process, from the date of the aforementioned notification from Trio to CalGEM, to the date that cyclic-steam injection may be reinitiated, can probably be accomplished in a matter of weeks (e.g., maybe 2 or 3 weeks).

17. Background information (confirmed in the aforementioned Zoom meeting with CalGEM's Jon Iverson). I understand that it is not urgent but that it would be good if Trio in the near future could load to CalGEM's WellStar Website updated reports (i.e., the so-called Project Approval Letter and/or "PAL" reports) for Hangman Hollow's two UIC Projects #64406013 and #44800005.

18. Background information (confirmed in the aforementioned Zoom meeting with CalGEM's Jon Iverson). In summary, I understand that Trio may restart oil production at any time (e.g., producing one or more wells "cold", without steam) and within a matter of weeks (e.g., maybe 2 or 3 weeks) would probably have authorization from CalGEM to resume water disposal into the WD-1 well and cyclic-steam injection into selected wells: assuming that the mechanical integrity tests are acceptable in said selected wells. I understand that the

aforementioned regulatory processes with CalGEM may be handled in a matter of weeks and in this regard that Hangman Hollow could be producing oil, injecting steam and disposing of produced water by injection in a matter of weeks from the date that operations are restarted. However, aside from the aforementioned regulatory processes that may be handled in a matter of weeks and from a practical operational standpoint, I understand that additional time may be required for Trio to get funding in-place, make tests and repairs to facilities and get the oilfield up and running.

19. Following are corrections to the record on certain assertions made in the Scholefield Declaration and the Motion. First, however, I wish to state that Mr. Scholefield and I have had quite a few phone conversations since about February 10, 2023, during which at great length we have had cordial, open and honest discussions about the matter at hand (i.e., sale of the Debtor's working interest), about the status of Hangman Hollow (e.g., status and details of UIC permits), and about possible paths by which Genautica and Trio may be able to move forward cooperatively in a mutually beneficial manner including, perhaps, restarting Hangman Hollow in the next month or two. I have been encouraged by the forward-looking and positive nature of our discussions. I believe it is correct to say that Mr. Scholefield now recognizes that some of the assertions in the Scholefield Declaration and/or the Genautica Motion are incorrect, albeit unbeknownst to Mr. Scholefield and/or Genautica at the time that the Genautica documents were created and filed with the Court. Trio requested that I attempt to correct some of the assertions made in the Genautica documents and I am doing so here, but I and Trio intend no disrespect to Mr. Scholefield and/or Genautica who are valued and important working-interest partners at Hangman Hollow.

20. The Scholefield Declaration incorrectly refers to the Property as Hangman's Hollow (Scholefield Decl., ¶2). The correct name is Hangman Hollow.

21. The Scholefield Declaration states "*In 2021, I was told by Stan Eschner, Trio's chairman, that the Project was ready to go and could start injecting steam and producing oil "tomorrow"*"(Scholefield Decl., ¶3). First, please note that Mr. Stan Eschner is a California registered professional geologist. Mr. Scholefield and Genautica incorrectly assert that this comment by Mr. Stan Eschner was incorrect and/or misleading. What Mr. Stan Eschner meant by this comment, as Mr. Scholefield is well aware, was that Hangman Hollow at that time (i.e., 2021) was fully and properly permitted for both water disposal and for steam injection and, in that sense, that operations could be restarted at any time (personal communication, Stan Eschner, Feb. 21, 2023). As Mr. Scholefield is well aware, Mr. Stan Eschner  was not suggesting that within one-day (i.e., "tomorrow") the field could be fully operational, with the steam generator fired-up and making steam, steam injection occurring, wells pumping oil and water, water disposal occurring, oil being sold to market, etc. Everyone involved in the Project, including Mr. Scholefield and Genautica, understands that restarting Hangman Hollow properly will require at least a week or two, possibly a month or more, due to matters such as handling routine regulatory processes, arranging funding, assigning project personnel, and routine maintenance items such as testing, inspections, repairs, etc. Mr. Stan Eschner's comment that the "*project was ready to go and could start injecting steam and producing oil tomorrow*" was his way of explaining that operations at the field could be restarted at any time (personal communication, Stan Eschner, Feb. 21, 2023) and was a figure of speech, which according to the Merriam-Webster dictionary is "*a word or phrase used in a nonliteral sense for rhetorical or vivid effect*".  Mr. Scholefield inappropriately has taken Mr. Stan Eschner's comment out of context, and impugned his reputation by construing that he lied when he said the Project was ready to go and could start injecting steam and producing oil tomorrow. Mr. Scholefield and Genautica are experienced in oil and gas operations and it is far-fetched to suppose that they were misled by Mr. Stan Eschner's comment. To Mr. Scholefield's benefit, I believe he was

not properly informed of the facts upon the date of the Scholefield Declaration and, had he been properly informed, he would have recognized that the aforementioned comment by Mr. Stan Eschner was reasonable, true and correct. As mentioned elsewhere above, Mr. Scholefield and/or Genautica apparently chose to disregard the information provided by Mr. Stan Eschner and instead incorrectly concluded that there were problems with the permits for the UIC projects that would prevent the timely restarting of operations.

22. The Scholefield Declaration states "*Genautica and Prudent bid at the August 10th auction based on the representations of the Brokers that the Project was ready to produce oil, representations that we later learned were not correct*" (Scholefield Decl., ¶8). Trio has little knowledge of representations made by Brokers and is not responsible for Brokers' representations. However, it seems from the Scholefield Declaration and from Genautica's Motion that Mr. Scholefield and Genautica may have incorrectly believed that there are immediate problems with the permit to dispose of produced water and/or with the permit to cyclically inject steam, and that they incorrectly believed that these perceived permit problems would prevent the quick restart of operations at Hangman Hollow. Mr. Scholefield's and Genautica's understanding in this matter is incorrect. As discussed elsewhere above, I understand that at Hangman Hollow oil production may recommence at any time and the process of restarting cyclic-steam injection and water-disposal may be accomplished in a matter of weeks. Thus, it appears that Genautica and Prudent bid at the August 10th auction based on true and correct representations of the Brokers that the Project was ready to produce oil. Furthermore, and as Mr. Scholefield and I recently discussed, one of the lower-cost and more economically-attractive plans under discussion is to restart Hangman Hollow by initially producing some wells "cold" (i.e. without cyclic-steam injection), in which case cyclic-steam injection probably would not occur in the opened wells for several months or longer. Some of

the existing wells initially produced "cold" oil at reasonably good rates and there is reasonable

expectation that these wells will do so again.

23. The Scholefield Declaration states *"Prior to the sale hearing and auction, the Brokers marketed the Property for sale. In the weeks leading up to the auction, I had telephone calls with Wesley Adams ("Adams"), the representative of the Brokers handling the sale, regarding the status of the Project and conditions of the sale. During those conversations, it was represented that the Project was ready to produce oil. The Brokers' statements seemed to confirm what Trio told me in 2021. I was later told by Kris Pitta ("Pitta") of Prudent Resources that he had had similar conversations prior to the auction. The representation that the Project is ready to produce oil is crucial to the value of the Property, and Pitta and I relied on this representation in formulating our bids at the auction. However, this representation was discovered to be incorrect"* (Scholefield Decl., ¶9). As discussed more-fully above, it seems from the Scholefield Declaration and from Genautica's Motion that Mr. Scholefield and Genautica may have incorrectly believed that there are problems with the permit to dispose of produced water and/or with the permit to cyclically inject steam, and that they incorrectly believed these perceived permit problems would prevent the quick restart of operations at Hangman Hollow. Mr. Scholefield's and Genautica's understanding in this matter is incorrect and, similarly, Mr. Kris Pitta of Prudent Resources may also have been misinformed. As discussed elsewhere above, I understand that at Hangman Hollow oil production may recommence at any time and the process of restarting cyclic-steam injection and water-disposal may be accomplished in a matter of weeks. Mr. Adams' assertion that the Project was ready to produce oil was correct.

24. The Scholefield Declaration states *"Consistent with the Brokers' statements that the property was ready to produce, the marketing materials were posted on the Brokers' website under the category "Producing Properties"* (Scholefield Decl., ¶11). Genautica is a working-

interest owner in Hangman Hollow and certainly it and Mr. Scholefield are well aware that Hangman Hollow is a producing property that is currently shut-in and idle. It seems far-fetched to suggest that it was somehow misleading for the Brokers to list the Property as a "Producing Property" and/or that Mr. Scholefield and/or Genautica were somehow confused or misled by this listing category.

25. The Scholefield Declaration states "*In describing the Project, the 2021 Marketing Materials state: The Hangman Hollow field is currently idled pending final approval of steam injection*" (Scholefield Decl., ¶12). As mentioned elsewhere above, Trio has little knowledge of representations made by Brokers and is not responsible for Brokers' representations. However, a comment in 2021 that the "*field is currently idled pending final approval of steam injection*" would have been incorrect because the cyclic-steam permit was fully-approved and effective at that time as it is today. This incorrect statement would have underrepresented, not overrepresented, the value of the Property. A more correct statement at that time would have been the "field is currently idled because some of the working-interest owners are in arrears in payments to the Operator and, consequently, funding currently is inadequate to restart the field".

26. The Scholefield Declaration states that the Brokers' 2021 Marketing Materials state that "*Temblor recently received aquifer exemption to enable steam flood injection*" (Scholefield Decl., ¶12). As mentioned elsewhere above, Trio has little knowledge of representations made by Brokers and is not responsible for Brokers' representations. However, a comment in 2021 that "*Temblor recently received aquifer exemption to enable steam flood injection*" would have been incorrect because the Aquifer Exemption was not received by Temblor, per se, and because the approval was for cyclic-steam injection and not for steam-flood injection. This incorrect statement would not have materially underrepresented or overrepresented the value of the Property. A more correct statement at that time would have been "the US EPA approved

Aquifer Exemption of the Lombardi oil sands at Hangman Hollow on November 21, 2018, and

CalGEM approved the cyclic-steam project at Hangman Hollow on October 4, 2019".

27. The Scholefield Declaration states "*After the Sale Order was entered, however, I came to learn that the representation that Project was ready to produce oil was incorrect. The Project is not producing or ready to produce oil; rather the Project is presently inoperable, the Project is likely one or more years away from being operable, and the Project will require significant further investment before becoming operable and before required approvals can be obtained. In fact, Genautica has recently been advised by California Geologic Energy Management ("CalGEM") which is one of several regulatory bodies governing oil and gas in California, that comprehensive updates and reviews are required to reestablish Underground Injection Control ("UIC") related permits and to proceed with several essential components of the Project including steam injection, oil and gas well production and storage, and proposed water disposal*" (Scholefield Decl., ¶13). There is considerable misinformation in this referenced Paragraph 13. As discussed elsewhere above, I understand that at Hangman Hollow oil production may recommence at any time and the process of restarting cyclic-steam injection and water-disposal may be accomplished in a matter of weeks. If funds were available to restart the field, for example if Genautica would pay its arrears owed to Trio, then the statement "*the Project is likely one or more years away from being operable*" would be incorrect. It is true that "*further investment*" will be required to restart the field and this fact should not be construed by Mr. Scholefield and/or Genautica as a reason to reopen the bankruptcy proceedings. It is true "*that comprehensive updates and reviews*" of most if not all approved UIC projects, including the two approved UIC projects at Hangman Hollow, are commonly and routinely requested by CalGEM, but this update/review process does not in any way impede and/or constrain Trio's ability to recommence operations at Hangman Hollow. Again, and as discussed elsewhere above, I understand that at Hangman Hollow oil production may recommence at any time and

the process of restarting cyclic-steam injection and water-disposal may be accomplished in a matter of weeks. The fact that routine and normal reviews and updates are in-progress for the two approved UIC Projects at Hangman Hollow should not be construed by Mr. Scholefield and/or Genautica as a reason to reopen the bankruptcy proceedings.

28. The Scholefield Declaration states "*I also learned that the materials prepared by the Brokers were inaccurate and misleading. The representation that the Project was idled "pending final approval of the steam injection permit" is inaccurate. The Project was idled because of an expensive, time-consuming permit updating and approval process involving the critical new water disposal well "WD-2" application*" (Scholefield Decl., ¶14). As discussed elsewhere above, any statement "*that the Project was idled pending final approval of the steam injection permit*" that is dated after October 4, 2019, which is the date that the cyclic-steam project was approved, would be inaccurate. A more-correct statement post October 4, 2019, would be that the "field is currently idled because some of the working-interest owners are in arrears in payments to the Operator and, consequently, funding currently is inadequate to restart the field". Mr. Scholefield is incorrect in his assertion that the Project is idled due to the application for the WD-2 water disposal well. Trio no-longer plans to drill the WD-2 well and is no-longer seeking a permit for the WD-2 well. A permit for the WD-2 well is not needed at all and is not needed prior to restarting the field.

29. The Scholefield Declaration states "*With regard to the steam injection permit specifically referenced in the 2021 Marketing Materials, while it is true in that in 2019 Trio obtained a steam injection permit, as indicated in an email dated September 13, 2022 from Pitta to the Trustee, in 2021, CalGEM provided written notice to Trio that the Project would need to undergo Project Approval Letter ("PAL") review. Thus, the injection permit was no longer current. In other words, the representation in the marketing materials that the Project was idled pending final review of the injection permit was incorrect, the steam injection and/or*

*water disposal permit needed to be brought current*" (Scholefield Decl., ¶15). As discussed

elsewhere above, updates and reviews are commonly and routinely requested by CalGEM,

commonly annually, for most if not all approved UIC projects, including the two approved UIC

projects at Hangman Hollow, but this update/review process does not in any way impede

and/or constrain Trio's ability to recommence operations at Hangman Hollow, including cyclic-

steam injection, oil/gas production, storage and/or water disposal. As discussed elsewhere

above, I understand that at Hangman Hollow oil production may recommence at any time and

the process of restarting cyclic-steam injection and water-disposal may be accomplished in a

matter of weeks. It is true that Trio received two notices dated April 21, 2021, from CalGEM,

referring to the two approved UIC Projects at Hangman Hollow, stating among other things "In

light of recent changes to applicable regulatory requirements for underground injection

projects, including various elements of required supporting data, CalGEM believes it will be

necessary for you to provide a complete updated package of supporting data for the above-

identified project" and to schedule a meeting to "discuss in more detail expectations regarding

this project data update, including a timeline for when the update will be completed".

Coincidentally, on April 19, 2021, two days prior to the CalGEM notices, Trio submitted to

CalGEM a sixty-one page updated report entitled "UIC-#64406013-

ProjectReportAndApplic.HH-2-RD1-WD_041921" with two Appendixes (i.e., Appendix-

A_CasingDiagrams_041921 and Appendix-B_ChemicalAnalysisOfProducedWater_041921),

which largely satisfies CalGEM's request for an updated report on this UIC project.

Furthermore, as mentioned elsewhere above (see Background information - confirmed in the

aforementioned Zoom meeting with CalGEM's Jon Iverson), I understand that it is not urgent

but that it would be good if Trio in the near future could load to CalGEM's WellStar Website

updated reports for Hangman Hollow's two UIC Projects #64406013 and #44800005. In the

aforementioned Zoom meeting with CalGEM's Mr. Jon Iverson on February 23, 2023, he

indicated that further updates to the reports for these two UIC Projects are not urgent, in part, because both are considered "fairly new" by CalGEM.

30. The Scholefield Declaration states *"Further, while the 2019 letter from CalGEM issuing the permit was provided to Prudent, the 2021 letter saying the Project would need to undergo PAL review was not provided to them until after the auction"* (Scholefield Decl., ¶16). There was a virtual meeting among myself, Trio and Kris Pitta of Prudent on August 18, 2022, during which time we discussed the Project, permits, the proposed restart of the field, and related matters. I'm surprised to see the email dated September 13, 2022, provided by Genautica in their Exhibit D, in which Mr. Pitta indicates concern, based apparently on information from CalGEM, that a PAL review of an injection permit is required and that an injection permit is not valid. As discussed elsewhere above, PAL updates and reviews are commonly and routinely requested by CalGEM, commonly annually, for most if not all approved UIC projects, including the two approved UIC projects at Hangman Hollow, but this update/review process does not in any way impede and/or constrain Trio's ability to recommence operations at Hangman Hollow, including cyclic-steam injection, oil/gas production, storage and/or water disposal. As discussed elsewhere above, I understand that at Hangman Hollow oil production may recommence at any time and the process of restarting cyclic-steam injection and water-disposal may be accomplished in a matter of weeks.

31. The Scholefield Declaration states *"The representations in the marketing materials regarding the Debtor having received necessary aquifer exempt UIC permits are also incorrect. I only recently learned the Project has been "on hold" by CalGEM since 2018 because the existing water disposal well is insufficient for the Project as planned. In order to secure the approvals and permits required to proceed, an updated project approval application must be submitted for approval and permitting to various governmental oversight agencies, none of which has happened nor is it certain to happen"* (Scholefield Decl., ¶17). The three

sentences quoted above from the Scholefield Declaration are full of misleading and confusing misinformation and incorrect statements. The US EPA has deemed as Aquifer Exempt at Hangman Hollow the Santa Margarita Sand, 'D' Sand and Lombardi oil sands. To the best of my knowledge and understanding, the aquifer exempt status of these sands at Hangman Hollow is not challenged by any "governmental oversight agencies". To the best of my understanding, knowledge and recollection the UIC Water-Disposal Project at Hangman Hollow, which was approved in May, 2013, has since never been "on-hold". As discussed elsewhere above, PAL updates and reviews are commonly and routinely requested by CalGEM, commonly annually, for most if not all approved UIC projects, including the two approved UIC projects at Hangman Hollow, but this update/review process does not in any way impede and/or constrain Trio's ability to recommence operations at Hangman Hollow, including cyclic-steam injection, oil/gas production, storage and/or water disposal. As discussed elsewhere above, Trio submitted to CalGEM on April 19, 2021, a sixty-one page updated report on the Water Disposal Project at Hangman Hollow. Also as mentioned elsewhere above, Mr. Jon Iverson on February 23, 2023, indicated that further updates to the reports for the two UIC Projects at Hangman Hollow are not urgent, in part, because both are considered "fairly new" by CalGEM. I understand that at Hangman Hollow oil production may recommence at any time and the process of restarting cyclic-steam injection and water-disposal may be accomplished in a matter of weeks.

32. The Scholefield Declaration states "*Notably, in September 2022, after the auction, I visited the Brokers' website and noticed that marketing materials had been updated to delete references to these permits and exemptions. I downloaded a copy of those materials to my computer (the "2022 Marketing Materials"). The reference to the Project being idled "pending final approval of steam injection" was deleted; and the reference to "Temblor recently received aquifer exemption to enable steam flood injection" was also deleted*" (Scholefield Decl., ¶18). As mentioned elsewhere above, Trio has little knowledge of representations made

by Brokers and is not responsible for Brokers' representations. However, and as discussed elsewhere above, a comment dated after October 4, 2019, that the field is currently idled "*pending final approval of steam injection*" would have been incorrect because the cyclic-steam permit was fully-approved and effective at that time as it is today. This incorrect statement would have underrepresented, not overrepresented, the value of the Property. A more correct statement at that time would have been the "field is currently idled because some of the working-interest owners are in arrears in payments to the Operator and, consequently, funding currently is inadequate to restart the field". Also, and as discussed elsewhere above, a comment that "*Temblor recently received aquifer exemption to enable steam flood injection*" would have been incorrect because the Aquifer Exemption was not received by Temblor, per se, because receiving aquifer exemption status does not enable steam flood injection, per se, and because the approval was for cyclic-steam injection and not for steam-flood injection. This incorrect statement would not have materially underrepresented or overrepresented the value of the Property. A more correct statement would have been "the US EPA approved Aquifer Exemption of the Lombardi oil sands at Hangman Hollow on November 21, 2018, and CalGEM approved the cyclic-steam project at Hangman Hollow on October 4, 2019". It appears, based on Mr. Scholefield's comments, that the Brokers after the auction deleted comments that were inaccurate and one of which (i.e., pending final approval of steam injection) underrepresented the value of the Property.

33. The Scholefield Declaration states "*During and after the auction, it became apparent that the Brokers were mistaken and confused about whether and to what extent Trio would assert claims against the Debtor's working interest. (Genautica disputes the validity of Trio's claims and rights). As a result, the Trustee and Brokers provided the bidders with materially different terms of the sale, and the bidders bid at auction based on different terms. If for no other reason, the sale should be set aside due to the fact that the only two bidders competing in*

*the auction were given different sets of bid instructions by the Brokers and Trustee; an auction*

*was conducted in which bidders unknowingly were not bidding on the same terms, conditions,*

*and/or assets*" (Scholefield Decl., ¶18). In an email dated July 5, 2022, from Mr. Scholefield to

Trustee, Mr. Scholefield asks "*Is the Temblor interest being offered/sold free of liability in the*

*bankruptcy proceeding?*" (page 47 of 49 in Exhibit G in the Exhibits). Subsequently, during

the oral-auction bankruptcy proceeding on October 8, 2022, Mr. Scholefield stated "*Your*

*Honor, we would like to - - we've reached a point, a price point above which we would be*

*willing to bid higher; however, we were not given adequate information about the outstanding*

*liabilities that we're being asked to assume and we'd like to have the balance of that*

*information provided in order to place a higher bid. So we request that that information be*

*provided to us and that the bidding be continued at a later time and in order for us to place a*

*higher bid, but have an understanding of what the outstanding liabilities are*" (page 12-13 of

Exhibit A in the Exhibits). The aforementioned email from Mr. Scholefield on July 5, 2022,

and the aforementioned comments to the Court three months later on October 8, 2022, clearly

indicate that Mr. Scholefield and Genautica did not properly do their own due diligence and,

therefore, were unprepared during the oral-auction bankruptcy proceeding. Mr. Scholefield's

and/or Genautica's lack of preparation should not be construed as a basis to reopen the

bankruptcy proceedings. I understand that it is not the responsibility of the Brokers (i.e., Energy

Advisors Group), Trustee and/or Debtor to resolve any such dispute and/or to eliminate any

uncertainty related thereto. Nevertheless, the original sale motion with the notice of hearing

with bidding instructions stipulates "*the sale of the subject property is in "as is" condition, and*

*buyer is subject to any all liens, encumbrances, charges, taxes, fees and delinquencies*

*attributed to the Debtor's share of joint interest liabilities.*" (¶ 5.e, page 10 of 15).

34. The Scholefield Declaration states "*The Brokers represented to me numerous times*

*before and after the auction that Trio's claims would be extinguished or otherwise cut off*

*against the buyer by the sale in the bankruptcy case. Later, I learned that Adams had made the same representations to Pitta, and as a result, at the auction Prudent was bidding for the Property believing the Property would be transferred free and clear of Trio's purported interests*" (Scholefield Decl., ¶20). As discussed elsewhere above, Trio has little knowledge of representations made by Brokers and is not responsible for Brokers' representations. Nevertheless, Mr. Scholefield, Genautica and Prudent had sufficient time prior to and after the auction to do their own due diligence on this matter. I understand that it is not the responsibility of the Brokers to resolve this matter and/or to eliminate any uncertainty related thereto. Nevertheless, the original sale motion with the notice of hearing with bidding instructions stipulates "*the sale of the subject property is in "as is" condition, and buyer is subject to any all liens, encumbrances, charges, taxes, fees and delinquencies attributed to the Debtor's share of joint interest liabilities.*" Mr. Scholefield's and/or Genautica's lack of due diligence and lack of preparation should not be construed as a basis to reopen the bankruptcy proceedings.

35. The Scholefield Declaration states "*On August 17, 2022, after the auction, I received a phone call from Adams in which he said that Pitta was upset that Prudent was being asked to pay the Debtor's prior outstanding liabilities. During the call, I stated that the bankruptcy papers said that liabilities were included in the terms of sale, but the Brokers disagreed. Accordingly, I sent Adams the Sale Motion, Declaration and Exhibit [Dkts, 416, 418, and 419] which had been sent to me by the Trustee. A true and correct copy of my August 17, 2022 email exchange with Adams (without attachments) is attached hereto as Exhibit G. In response, Adams sent me the Notice of Hearing, Dkt. 417, which had been sent to him by the Trustee, and he told me he had not seen the other documents*" (Scholefield Decl., ¶21). As discussed elsewhere above, Trio has little knowledge of representations made by Brokers and is not responsible for Brokers' representations. Nevertheless, Mr. Scholefield, Genautica and Prudent had sufficient time prior to and after the auction to do their own due diligence on this matter. I

understand that it is not the responsibility of the Brokers to resolve this matter and/or to eliminate any uncertainty related thereto. Nevertheless, the original sale motion with the notice of hearing with bidding instructions stipulates *"the sale of the subject property is in "as is" condition, and buyer is subject to any all liens, encumbrances, charges, taxes, fees and delinquencies attributed to the Debtor's share of joint interest liabilities."* Mr. Scholefield's and/or Genautica's lack of due diligence and lack of preparation should not be construed as a basis to reopen the bankruptcy proceedings.

36. The Scholefield Declaration states *"Adams told me that he relied on the Notice of Hearing which omitted any reference to the sale being subject to any other claims or interests, and that, as a result, he believed that the sale would extinguish Trio's claim against the Debtor's working interest which would stay with the estate. Adams told me that he provided the Notice of Hearing to Prudent, namely Dkt. 417"* (Scholefield Decl., ¶22). As discussed elsewhere above, Trio has little knowledge of representations made by Brokers and is not responsible for Brokers' representations. Nevertheless, Mr. Scholefield, Genautica and Prudent had sufficient time prior to and after the auction to do their own due diligence on this matter. I understand that it is not the responsibility of the Brokers to resolve this matter and/or to eliminate any uncertainty related thereto. Nevertheless, the original sale motion with the notice of hearing with bidding instructions stipulates *"the sale of the subject property is in "as is" condition, and buyer is subject to any all liens, encumbrances, charges, taxes, fees and delinquencies attributed to the Debtor's share of joint interest liabilities."* Mr. Scholefield's and/or Genautica's lack of due diligence and lack of preparation should not be construed as a basis to reopen the bankruptcy proceedings.

37. The Scholefield Declaration states *"At the auction, relying on the misstatements to Prudent both as to the condition of the property and as to Prudent's potential for liability to Trio, Prudent was enticed to bid up the Property to $101,000, 10 times Trio's stalking horse*

*bid*" (Scholefield Decl., ¶23). The Scholefield Declaration does not bring to light any misstatements that could be construed to exaggerate or overstate the value of the Property. However, as discussed elsewhere above, some of the incorrect statements (e.g., that the Property was idle due to permit issues) could be construed to understate the value of the Property.

38. The Scholefield Declaration states "*After the auction, Prudent learned that not only was the information about the permitting and status of the Project incorrect, but also that Trio would claim that Prudent would potentially be charged with the Debtor's pre-petition liabilities, despite the representations the bidders received to the contrary. Ultimately, Prudent pulled out of the sale. Based on my conversations with Pitta, I believe that had Prudent known of the true facts, it likely would not have participated in the auction, and Genautica's opening bid at $15,000 would have been the highest bid*" (Scholefield Decl., ¶24). These comments by Mr. Scholefield appear to be conjecture and speculation. It appears that Prudent's bid was based on a correct understanding that the UIC permits were fully-approved and in good standing, and it was after the auction that Prudent became misinformed with the notion that there was a permit problem that would prevent the quick restart of the field. Prudent has expertise in acquiring distressed properties and I believe it reasonable to assume that it recognized that there were uncertainties regarding Debtor's liabilities. I don't wish to speculate as to whether $15,000 might have been the highest bid.

39. The Scholefield Declaration states "*Genautica is still interested in acquiring the Property, even though the true facts revealed that the Property was worth substantially less than previously thought. Genautica offered to revise its bid to its opening bid amount ($15,000) and immediately close the transaction Genautica remains willing to purchase the Property for $15,000 or to participate in a new auction for the purchase of the Property*" (Scholefield Decl., ¶25). As discussed elsewhere above, The Scholefield Declaration does not bring to light any

misstatements that could be construed to exaggerate or overstate the value of the Property. However, as discussed elsewhere above, some of the incorrect statements (e.g., that the Property was idle due to permit issues) could be construed to understate the value of the Property. Genautica as a backup bidder had an opportunity to close the sale, but Genautica did not perform. Genautica missed its opportunity to close the sale, and Trio is the rightful winning bidder. Genautica's offer to close the sale at its initial bid of $15,000 is without merit and should be ignored.

40. The Scholefield Declaration states "*Awarding the Property to Trio, for the lowest bid, rather than reopening the auction to fair and transparent competitive bidding, that will guaranty the estate a 50% higher price for the Debtor's property, is not in the interests of justice*" (Scholefield Decl., ¶27). It appears that Mr. Scholefield and Genautica regret that they did not close the sale when they had the opportunity to do so and that they now propose to change the rules in an attempt to reverse the court's decision that Trio is the rightful winning bidder. I do not see how this is in the interest of justice.

41. The Scholefield Declaration states "*The 2021 Marketing Materials contain information, including graphs and charts, that is not readily accessible to any entity other than Trio, as Operator of the Project. The information in the marketing materials must have come from Trio as operator of the Project. Such information is unlikely to have come from any other source*" (Scholefield Decl., ¶28). As mentioned elsewhere above, Trio has little knowledge of representations made by Brokers and is not responsible for Brokers' representations. Furthermore, Trio has little knowledge of what comprised the Marketing Materials and is not responsible for said Marketing Materials. Trio as Operator over the years has provided a vast amount of Hangman Hollow data and interpretations to the Hangman Hollow working-interest owners, including to Genautica and Temblor ("Debtor"), and also to the California Division of Oil, Gas, and Geothermal Resources ("DOGGR"), CalGEM, WaterBoards, Petroleum Listing

Services, Energy Advisors Group, Energy Net and many other third-parties. To the best of my knowledge and recollection, neither I nor Trio collaborated with the Brokers, Trustee and/or Debtor in selecting, and/or in reviewing for accuracy, whatever marketing materials they chose for use in the bankruptcy proceedings.

42. The Scholefield Declaration states "*Trio, as Operator, is the entity that failed to obtain the necessary permits to let the Project proceed. Trio never informed Genautica, nor was Genautica informed by the Brokers or Trustee, that CalGEM put the water disposal well application on hold together with the entire PAL, or of any of the other challenges facing the Project, all of which was concealed by Trio*" (Scholefield Decl., ¶29). Trio, as Operator, has successfully obtained the permits that are necessary for production at Hangman Hollow to proceed, including permits for water disposal and cyclic-steam injection. To the best of my knowledge CalGEM has never put the "water well application" on hold, nor has CalGEM put the "entire PAL" (whatever that means) on hold.

43. The Scholefield Declaration states "*Additionally, I was recently informed that Trio instructed CalGEM to put the Project on the backburner and reassign its project review engineer to Trio's unrelated South Salinas prospect*" (Scholefield Decl., ¶29). To the best of my understanding, knowledge and recollection, this statement is entirely false. I do not believe that I or anyone at Trio advised CalGEM to put the Hangman Hollow project on the back burner and/or to reassign a CalGEM engineer to another of Trio's projects. In my experience, Trio does not instruct CalGEM as to how to utilize their people, and CalGEM does not take any such instructions from Trio.

44. The Genautica Motion repeats many if not all of the incorrect assertions that are in the Scholefield Declaration, which incorrect assertions are already addressed in the comments above. To avoid redundancy, I here do not directly comment on and/or correct the incorrect assertions that are in the Motion if said incorrect assertions are already addressed in the

comments above that refer to the Scholefield Declaration. However, some of the incorrect

assertions in the Genautica Motion are addressed separately below.

45. The Genautica Motion states *"the bidders were induced to overbid based on the*

*Brokers'1 misstatements of fact (in which Trio is, at the very minimum, complicit)" (p. 2, lines*

*11-12).* As mentioned elsewhere above, Trio has little knowledge of representations made by

Brokers and is not responsible for Brokers' representations. The suggestion that Trio is

somehow complicit in any of *"Brokers' misstatements of fact"* is inflammatory and absurd.

Furthermore, and as discussed elsewhere above, neither the Genautica Motion nor the

Scholefield Declaration bring to light any misstatements that could be construed to exaggerate

or overstate the value of the Property. However, as discussed elsewhere above, some of the

incorrect statements (e.g., that the Property was idle due to permit issues) could be construed to

understate the value of the Property.

46. The Genautica Motion states *"In effect, Trio's silence regarding the representations in*

*the marketing materials, caused the parties to bid up the auction price which Trio thought*

*would result in payment of its claims"* (p. 14, lines 1-2). To the best of my understanding,

knowledge and recollection, neither I nor Trio have to this day been provided copies of the

marketing materials by anyone (e.g., not by the Brokers, Trustee, Debtor, Genautica and/or

Prudent) and, furthermore, neither I nor Trio have been asked by anyone (e.g., not by the

Brokers, Trustee, Debtor, Genautica and/or Prudent) to verify the assertions made in the

marketing materials. I understand that the marketing materials may be comprised, in part, of

materials that were prepared over the years by me and/or Trio, but neither I nor Trio has even

seen the marketing materials data-package, per se. In other words, we have not seen the data

package prepared by Brokers that comprises the marketing materials. The claim that Trio's

silence about a marketing materials data-package, which Trio has never seen, caused the parties

to bid up the auction price is absurd. The suggestion that Trio was silent about a marketing

materials data-package, which Trio has never seen, because Trio thought this would result in payment of the money owed to Trio is absurd. As mentioned elsewhere above, Trio endeavored to acquire the Debtor's working interest in Hangman Hollow at a cost to Trio, in Trio's opinion, of $246,911.44 (i.e., Trio's $10,000 cash bid plus the $236,911.44 in Debtor's debt that would be absorbed by Trio).

47. The Genautica Motion states *"The Sale Order, as amended, rewards Trio for submitting the lowest bid, not participating at the auction, not disclosing the true facts about the Project's permitting, or lack thereof"* (p.15, lines 3-4). As mentioned elsewhere above, Trio has little knowledge of representations made by Brokers and is not responsible for Brokers' representations. The suggestion that Trio has somehow been involved in *"not disclosing the true facts about the Project's permitting, or lack thereof"* is outrageous, inflammatory and absurd. As stated elsewhere above, to the best of my understanding, knowledge and recollection, neither I nor Trio have to this day been provided copies of the marketing-materials data package by anyone (e.g., not by the Brokers, Trustee, Debtor, Genautica and/or Prudent) nor asked by anyone to review and/or inspect the marketing-materials data package. Furthermore, I believe that all of the assertions in the Genautica Motion and in the Scholefield Declaration regarding current problems with the permits for the water disposal project and/or for the cyclic-steam project are incorrect. As discussed elsewhere above, I understand that at Hangman Hollow oil production may recommence at any time and the process of restarting cyclic-steam injection and water-disposal may be accomplished in a matter of weeks.

48. In summary, it is my opinion that all of the material claims in the Genautica Motion and in the Scholefield Declaration are false and that the Court's decision to award Debtor's WI to Trio should stand. Trio's bid, in Trio's opinion, represents a total of $246,911.44 (i.e., Trio's $10,000 cash bid plus the $236,911.44 in Debtor's debt that would be absorbed by Trio). Trio considers this a very serious bid.

49. As of the date signed, I believe the facts in this declaration are accurate. Trio and I are continuing our efforts to present an accurate record to the court, and I will supplement this declaration before the hearing, if required to augment or clarify the record.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and if called as a witness I could and would testify competently thereto.

Signed on March 22, 2023, at Denver, Colorado.

Original

Terence B. Eschner

President, Sarlan Resources, Inc.