STRADLING YOCCA CARLSON & RAUTH, P.C.
Paul R. Glassman (State Bar No. 76536)
Tatiana Ingman (State Bar No. 314284)
10100 Santa Monica Blvd., Suite 1400
Los Angeles, CA 90067
Telephone: (424) 214-7000
Facsimile: (424) 214-7010
E-mail: pglassman@stradlinglaw.com
       tingman@stradlinglaw.com

Attorneys for Genautica Oil Holdings, LP

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>TEMBLOR PETROLEUM COMPANY, LLC<br><br>                                    Debtor. | Case No. 2020-11367<br><br>Chapter 7<br>Docket Control Number: PRG-3<br>**DECLARATION OF DAN SCHOLEFIELD IN SUPPORT OF AMENDED MOTION OF GENAUTICA OIL HOLDINGS, LP TO VACATE SALE ORDER, AS AMENDED**<br><br>Hearing<br>Date:  June 14, 2023<br>Time:  1:30 p.m.<br>Place:  2500 Tulare Street, Suite 2501<br>          Fresno, CA 93721<br><br>Judge:  Hon. Jennifer Niemann |

I, Dan Scholefield, hereby declare:

1.    I am the authorized representative of Genautica Oil Holdings, LP ("Genautica"). I have personal knowledge of the matters set forth in this declaration, and if called upon to testify, I would and could competently testify thereto. I submit this Declaration in Support of the *Motion Of Genautica Oil Holdings, LP To Vacate Amended Order* (the "Motion").[1]

2. The Debtor holds a 24.44% working interest (the "Property") in an oil field project (the "Project") referred to as Hangman Hollow.

3. Trio is the operator of the Project and its largest working interest holder, holding 43%. The Debtor is the second largest working interest holder, and Genautica is a working interest holder, having purchased its 12.22% interest from both Trio and the Debtor (collectively) in 2013. In 2021, I was told by Stan Eschner, Trio's chairman, that the Project was ready to go and could start injecting steam and producing oil "tomorrow."

4. Acquisition of the Property would give Trio majority control of the Project.

5. On June 16, 2022, prompted by the Trustee's notice of intent to abandon the Debtor's interest in another oil field, I wrote to the Trustee stating Genautica's interest in bidding on the Property.

6. On August 2, 2022, Genautica submitted its $10,000 deposit to the Trustee.

7. On August 10, 2022, the Court held an auction of the Property. Trio was present, but did not bid. Prudent was named the winning bidder, and Genautica was named the backup bidder. A true and correct copy of the transcript of the August 10, 2022 auction, as received by Genautica from Veritext Legal Solutions is attached hereto as Exhibit A.

**The Court Should Vacate the Sale Order Because the Bidders were Induced to Overbid by the Brokers' Misstatements that the Property was Ready to Produce Oil.**

8. Genautica and Prudent bid at the August 10th auction based on the representations of the Brokers that the Project was ready to produce oil, representations that we later learned were not correct.

9. Prior to the sale hearing and auction, the Brokers marketed the Property for sale. In the weeks leading up to the auction, I had telephone calls with Wesley Adams ("Adams"), the representative of the Brokers handling the sale, regarding the status of the Project and conditions of the sale. During those conversations, it was represented that the Project was ready to produce

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Motion.

2

oil. The Brokers' statements seemed to confirm what Trio told me in 2021. I was later told by Kris Pitta ("Pitta") of Prudent Resources that he had had similar conversations prior to the auction. The representation that the Project is ready to produce oil is crucial to the value of the Property, and Pitta and I relied on this representation in formulating our bids at the auction. However, this representation was discovered to be incorrect.

10. The Brokers posted promotional materials on their website. I reviewed these materials and downloaded them to my computer prior to the auction. A true and correct copy of the Brokers' promotional materials downloaded October 8, 2021 is attached hereto as Exhibit B (the "2021 Marketing Materials").

11. Consistent with the Brokers' statements that the property was ready to produce, the marketing materials were posted on the Brokers' website under the category "Producing Properties."

12. In describing the Project, the 2021 Marketing Materials state:
> The Hangman Hollow field is currently idled pending final approval of steam injection. Temblor recently received aquifer exemption to enable steam flood injection. The estate highlights 4.0 million barrels of original oil in place and 2.0 mm barrels recoverable."

At the top of the first page, in a section entitled "Recent Updates (5/21/21)" the materials state "Hangman Hollow project just received steam injection permit." The marketing materials imply that the permit that awaited final approval was recently approved as of May 21, 2021. A copy of the 2021 Marketing Materials with the relevant portions highlighted is attached hereto as Exhibit C. The information in the 2021 Marketing Materials further confirmed the Brokers' statement that the Project was ready to produce.

13. After the Sale Order was entered, however, I came to learn that the representation that Project was ready to produce oil was incorrect. The Project is not producing or ready to produce oil; rather the Project is presently inoperable, the Project is likely one or more years away from being operable, and the Project will require significant further investment before becoming operable and before required approvals can be obtained. In fact, Genautica has recently been advised by California Geologic Energy Management ("CalGEM") which is one of

several regulatory bodies governing oil and gas in California, that comprehensive updates and reviews are required to reestablish Underground Injection Control ("UIC") related permits and to proceed with several essential components of the Project including steam injection, oil and gas well production and storage, and proposed water disposal.

14. I also learned that the materials prepared by the Brokers were inaccurate and misleading. The representation that the Project was idled "pending final approval of the steam injection permit" is inaccurate. The Project was idled because of an expensive, time-consuming permit updating and approval process involving the critical new water disposal well "WD-2" application.

15. With regard to the steam injection permit specifically referenced in the 2021 Marketing Materials, while it is true in that in 2019 Trio obtained a steam injection permit, as indicated in an email dated September 13, 2022 from Pitta to the Trustee, in 2021, CalGEM provided written notice to Trio that the Project would need to undergo Project Approval Letter ("PAL") review. Thus, the <u>injection permit was no longer current</u>. In other words, the representation in the marketing materials that the Project was idled pending *final* review of the injection permit was incorrect, the steam injection and/or water disposal permit needed to be brought current. A true and correct copy of an email from the Trustee to me, forwarding an email from Pitta to the Trustee and Brokers, dated September 13, 2022 ("Sept. 13 Email") is attached hereto as Exhibit D.

16. Further, while the 2019 letter from CalGEM issuing the permit *was* provided to Prudent, the 2021 letter saying the Project would need to undergo PAL review *was not* provided to them until after the auction. Exh. D (Sept. 13 Email).

17. The representations in the marketing materials regarding the Debtor having received necessary aquifer exempt UIC permits are also incorrect. I only recently learned the Project has been "on hold" by CalGEM since 2018 because the existing water disposal well is insufficient for the Project as planned. In order to secure the approvals and permits required to proceed, an updated project approval application must be submitted for approval and permitting

to various governmental oversight agencies, none of which has happened nor is it certain to happen.

18. Notably, in September 2022, after the auction, I visited the Brokers' website and noticed that marketing materials had been updated to delete references to these permits and exemptions. I downloaded a copy of those materials to my computer (the "2022 Marketing Materials"). The reference to the Project being idled "pending final approval of steam injection" was deleted; and the reference to "Temblor recently received aquifer exemption to enable steam flood injection" was also deleted. A true and correct copy of the 2022 Marketing Materials is attached hereto as Exhibit E. A copy of the 2022 Marketing Materials with the relevant portions highlighted is attached hereto as Exhibit F.

**The Court Should Vacate the Sale Order Because the Bidders Were Bidding on Different Terms and Conditions.**

19. During and after the auction, it became apparent that the Brokers were mistaken and confused about whether and to what extent Trio would assert claims against the Debtor's working interest. (Genautica disputes the validity of Trio's claims and rights). As a result, the Trustee and Brokers provided the bidders with materially different terms of the sale, and the bidders bid at auction based on different terms. If for no other reason, the sale should be set aside due to the fact that the only two bidders competing in the auction were given different sets of bid instructions by the Brokers and Trustee; an auction was conducted in which bidders unknowingly were not bidding on the same terms, conditions, and/or assets.

20. The Brokers represented to me numerous times before and after the auction that Trio's claims would be extinguished or otherwise cut off against the buyer by the sale in the bankruptcy case. Later, I learned that Adams had made the same representations to Pitta, and as a result, at the auction Prudent was bidding for the Property believing the Property would be transferred free and clear of Trio's purported interests.

21. On August 17, 2022, after the auction, I received a phone call from Adams in which he said that Pitta was upset that Prudent was being asked to pay the Debtor's prior

outstanding liabilities. During the call, I stated that the bankruptcy papers said that liabilities were included in the terms of sale, but the Brokers disagreed. Accordingly, I sent Adams the Sale Motion, Declaration and Exhibit [Dkts, 416, 418, and 419] which had been sent to me by the Trustee. A true and correct copy of my August 17, 2022 email exchange with Adams (without attachments) is attached hereto as Exhibit G. In response, Adams sent me the Notice of Hearing, Dkt. 417, which had been sent to him by the Trustee, and he told me he had not seen the other documents.

22. Adams told me that he relied on the Notice of Hearing which omitted any reference to the sale being subject to any other claims or interests, and that, as a result, he believed that the sale would extinguish Trio's claim against the Debtor's working interest which would stay with the estate. Adams told me that he provided the Notice of Hearing to Prudent, namely Dkt. 417.

23. At the auction, relying on the misstatements to Prudent both as to the condition of the property and as to Prudent's potential for liability to Trio, Prudent was enticed to bid up the Property to $101,000, 10 times Trio's stalking horse bid.

24. After the auction, Prudent learned that not only was the information about the permitting and status of the Project incorrect, but also that Trio would claim that Prudent would potentially be charged with the Debtor's pre-petition liabilities, despite the representations the bidders received to the contrary. Ultimately, Prudent pulled out of the sale. Based on my conversations with Pitta, I believe that had Prudent known of the true facts, it likely would not have participated in the auction, and Genautica's opening bid at $15,000 would have been the highest bid.

**The Court Should Vacate the Sale Order And Reopen the Auction.**

25. Genautica is still interested in acquiring the Property, even though the true facts revealed that the Property was worth substantially less than previously thought. Genautica offered to revise its bid to its opening bid amount ($15,000) and immediately close the

1. transaction. Genautica remains willing to purchase the Property for $15,000 or to participate in a new auction for the purchase of the Property.

26. The Trustee's Motion to Amend was served on me, by email, at 3:54 p.m. The following day, I wrote to the Trustee objecting to the relief sought in the Motion to Amend and reiterating Genautica's willingness to purchase the Property for $15,000.

27. Awarding the Property to Trio, for the lowest bid, rather than reopening the auction to fair and transparent competitive bidding, that will guaranty the estate a 50% higher price for the Debtor's property, is not in the interests of justice.

28. The 2021 Marketing Materials contain information, including graphs and charts, that is not readily accessible to any entity other than Trio, as Operator of the Project. The information in the marketing materials must have come from Trio as operator of the Project. Such information is unlikely to have come from any other source.

29. Trio, as Operator, is the entity that failed to obtain the necessary permits to let the Project proceed. Trio never informed Genautica, nor was Genautica informed by the Brokers or Trustee, that CalGEM put the water disposal well application on hold together with the entire PAL, or of any of the other challenges facing the Project, all of which was concealed by Trio.

30. Additionally, I was recently informed that Trio instructed CalGEM to put the Project on the backburner and reassign its project review engineer to Trio's unrelated South Salinas prospect.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May __12__, 2023 in Agoura Hills, CA.

By: _/s/ Dan Scholefield_
DAN SCHOLEFIELD

7