Michael J. Gomez (State Bar No. 251571)
  mgomez@frandzel.com
Gerrick M. Warrington (State Bar No. 294890)
  gwarrington@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 Wilshire Boulevard
Nineteenth Floor
Los Angeles, California  90017-2427
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Creditor
TRIO PETROLEUM, LLC

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| In re<br><br>TEMBLOR PETROLEUM COMPANY, LLC,<br><br>     Debtor. | CASE No. 2020-11367<br><br>Chapter 7<br><br>DCN: PRG-3<br><br>**DECLARATION OF TERENCE ESCHNER IN SUPPORT OF TRIO PETROLEUM, LLC'S STATEMENT OF POSITION**<br><br>Date:   June 14, 2023<br>Time:  1:30 p.m.<br>Place:  Courtroom 11, Dept. A<br>            2500 Tulare Street, Fifth Floor<br>            Fresno, CA 93721<br><br>Judge:  Hon. Jennifer Niemann |

4930927v1 | 101458-0001                                1
DECLARATION OF TERENCE ESCHNER

I, Terence B. Eschner, declare:

1.　　I have frequently worked as Senior Associate Geological Advisor (*i.e.*, a consultant) to Trio Petroleum LLC ("Trio") through my company Sarlan Resources, Inc. ("Sarlan"). Trio is the operator of various oil and gas properties including a property known as the Hangman Hollow Area of the McCool Ranch Oil Field ("Hangman Hollow") that is located in Monterey County, California. I am over 18 years-old. I am and since 1995 have been the founder, owner and President of Sarlan, an oil and gas exploration and development company and a consultancy to the petroleum industry. I have personal knowledge of the matters set forth in this declaration, except where stated upon information and belief. My information regarding the Hangman Hollow field provided in this declaration is based on my knowledge from working as a consultant to Trio on Hangman Hollow since about 2012.

2.　　**Background**.

　　　　a.　　As a consultant to Trio on Hangman Hollow, I have worked extensively on matters including but not limited to interpreting technical data (*i.e.*, geological, geophysical, petrophysical and engineering data), obtaining and updating permits for underground injection control ("UIC") projects (note: there are two UIC projects at Hangman Hollow, one of which is UIC Project #64406013 that enables the disposal of waste water via injection into a water disposal well, and the other of which is UIC Project #44800005 that enables the periodic injection of steam into producing oil wells to improve oil recovery), supervision and/or monitoring during some drilling operations, marketing efforts to obtain new investors, and other such similar matters.

　　　　b.　　I was involved in the effort to obtain a UIC water-disposal permit for the Hangman Hollow oilfield, which was approved by CalGEM (defined below) in May, 2013, and which is critical for the successful development of the field. I was an instrumental player, along with Chevron and AERA Energy, in the effort to obtain Aquifer Exemption status for the

4930927v1 | 101458-0001　　　　　2
DECLARATION OF TERENCE ESCHNER

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Lombardi Sands in the Salinas Basin, which was approved by the EPA (defined below) on November 21, 2018, and which is critical for the successful development of the Hangman Hollow oilfield. I was a key player in the effort to obtain a UIC steam-injection permit for the Hangman Hollow oilfield, which was approved by CalGEM on October 4, 2019, and which is critical for the successful development of the field. I have been deeply involved in handling regulatory matters associated with the UIC steam-injection and water-disposal projects and their associated permits for Hangman Hollow field since those permits were originally approved. I am very familiar with the history and status of the UIC steam-injection and water-disposal projects and their associated permits for Hangman Hollow field since I was deeply involved with them. I have similar expertise on UIC regulatory matters at various other California oilfields.

  c. Apart from working on Hangman Hollow on behalf of Trio as a consultant and as the President of Sarlan, I am the acting President of Trio Petroleum Corp., a publicly-traded oil and gas exploration and development company (New York Stock Exchange - American: symbol "TPET"), not to be confused with Trio.

  d. I hold a Master's Degree in Geological Sciences from the University of Texas at Austin, received in 1982, and a Bachelor's Degree in Geological Sciences from San Diego State University, received in 1979. I am also a Registered Professional Geologist in the State of Wyoming (#PG-1876).

  e. I have over 40 years of experience in the petroleum industry, including approximately two years with Occidental Petroleum, followed by 10 years with Chevron USA, followed by approximately 31 years as an independent and consultant. I have petroleum-industry experience in many areas of the United States (*e.g.*, California, Rocky Mountain region, Mid-Continent region, Gulf Coast region, Eastern region, Alaska) and in the international arena (*e.g.*, Bahrain, Kuwait, Iraq, Algeria, Ghana, Gabon, Malaysia, Indonesia, Mexico, Colombia,

Venezuela, Bolivia, Argentina, Guyana). I have consulted for many companies including, to name a few, British Petroleum, Chevron, Occidental, Anadarko, Denbury Resources, Whiting, Kuwait Oil Company, Sonatrach, Cepsa, ENI, Maersk, Lasmo, Petronas, PDVSA, ECOPETROL, Gabon Oil, Mubadala, International Reservoir Technologies, SI International and Systems Technology Associates. I have since about 2015 been deeply involved in many California oil and gas projects, and deeply involved in obtaining permits and approvals from governmental regulatory agencies including the California Geologic Energy Management Division of the California Department of Conservation (CalGEM), the California Water Boards, and the United States Environmental Protection Agency (EPA).

3. **Connections.** In the furtherance of full disclosure, my father, Stanford Eschner, is co-owner of Trio and its CEO. Neither I nor any of my companies own any interest in Trio, and I am not an employee of Trio. I am not an attorney and my opinions and/or my understanding of the facts as stated herein are not to intended as legal opinions.

4. **Purpose.**

a. This declaration is an updated version of the "Declaration of Terence B. Eschner in Support of Trio's Opposition to Motion of Genautica Oil Holdings, LP to Vacate Sale Order, As Amended" that was filed on March 23, 2023, with the United States Bankruptcy Court, Eastern District of California. The purpose of this updated version of the declaration is to update and further clarify the record.

b. In this declaration I seek to correct the record regarding certain assertions made in the following three documents that were filed by Genautica Oil Holdings, LP ("Genautica"): 1) the NOTICE OF MOTION AND MOTION OF GENAUTICA OIL HOLDINGS, LP TO VACATE SALE ORDER, AS AMENDED" (the "Motion"); 2) the DECLARATION OF DAN SCHOLEFIELD IN SUPPORT OF THE MOTION OF GENAUTICA

OIL HOLDINGS, LP TO VACATE SALE ORDER, AS AMENDED (the "Scholefield Declaration" or "Scholefield Decl."), and; 3) the EXHIBITS TO DECLARATION OF DAN SCHOLEFIELD IN SUPPORT OF MOTION OF GENAUTICA OIL HOLDINGS, LP TO VACATE SALE ORDER, AS AMENDED (the "Exhibits"). I have reviewed and am familiar with the Motion, the Scholefield Declaration, and the Exhibits.

c. In this Declaration I do not seek to correct each and every false assertion made by Genautica. Rather, I seek to correct those false assertions that are particularly relevant to the Motion.

5. I believe that my previously-filed declaration demonstrated that: 1) all of the assertions in the prior Genautica Motion (dkt. 500) and in the prior Scholefield Declaration (dkt. 502) regarding current problems with the permits for the water disposal project and/or for the cyclic-steam project are false and incorrect; 2) that Mr. Scholefield in his declaration impugned my father, Mr. Stanford Eschner, and; 3) that all of the material claims in the prior Genautica Motion and in the prior Scholefield Declaration, particularly the claim that there were statements that overstated the value of the property, are flatly false and incorrect.

6. Furthermore, based on my personal communications with Mr. Scholefield, I believe that Mr. Scholefield now recognizes and understands that: 1) all of his assertions about there being problems with permits for the water disposal project and/or for the cyclic-steam project were false; 2) that he wrongly maligned Mr. Stanford Eschner, and; 3) that all of the material claims in the Motion and in his declaration, particularly the claim that there were statements that overstated the value of the property, are false. I spent hours with Mr. Scholefield over multiple days after his prior declaration was signed[1] going over these items and not once did he object or disagree with

---

[1] Examples of dates are February 10th, February 15th (almost three hours on this day alone), February 16th, February 17th, February 21st, March 6th, March 20th, March 21st, and so on.

me. Instead, Mr. Scholefield only expressed bewilderment at how he could have been so misinformed.

7. **The State of the Project.** From my review of the Exhibits and the Scholefield Declaration, it seems that Genautica is claiming it may have chosen to not perform as the backup bidder and voluntarily failed to pay the $76,000.00 owed at least in part because Genautica incorrectly concluded that there were problems with the permits for the UIC Water Disposal Project #64406013 and/or the UIC Cyclic-Steam Injection Project #44800005 that would prevent the timely restarting of operations at Hangman Hollow.[2] As elaborated below, there are no such problems with the UIC permits that would prevent the timely restarting of operations at Hangman Hollow.

8. The information provided in the following six paragraphs was confirmed by CalGEM engineer Mr. Jon Iverson in a Zoom meeting on February 23, 2023. Also participating in the Zoom meeting were Trio personnel Mr. Stan Eschner, Mr. Steve Rowlee and Mr. Gary Horace. After reading Mr. Scholefield's prior declaration, Trio reached out to CalGEM because I could not believe what I was reading and wanted to confirm with CalGEM that my understanding was not incorrect.

9. As confirmed in the Zoom meeting with CalGEM's Jon Iverson, Trio may restart producing oil wells at Hangman Hollow at any time without prior notification to CalGEM. If Trio does restart oil production, Trio would need to resume normal monthly reporting to CalGEM of produced fluid volumes (*i.e.*, volumes of oil, gas and water). Subsequent to the restarting of any such producing oil well, there might be testing requirements for previously idled wells, such as fluid level tests and/or tests of mechanical integrity.

---

[2] This charitable assumption may not be correct and there may be other reasons, including financial ones, why Genautica chose not to close the sale that it had won by default. When viewed closely though, it looks like Genautica is really claiming that the other bidder was misled.

10. As also confirmed in the Zoom meeting with CalGEM's Jon Iverson, the UIC Water Disposal Project #64406013, which enables water injection into the 'D' Sand and into the Santa Margarita Sand at the San Ardo WD-1 well at Hangman Hollow, is fully-approved and in good standing. The WD-1 well is classified by CalGEM as "idle". Because the WD-1 well is considered idle, Trio will need to notify CalGEM in advance of Trio's intent to reinitiate water disposal at that well. Trio recently successfully accomplished a routine mechanical integrity test of the WD-1 well, which will expedite approval by CalGEM of reinitiating injection at this well.

11. The entire process, from the date of the notification from Trio to CalGEM, to the date that water injection may be reinitiated, can probably be accomplished in a matter of weeks (*e.g.*, maybe 2 or 3 weeks). It is my understanding that: 1) when injection recommences, and according to regulatory protocols, Trio will collect a surface water sample (note: such collection can be accomplished in a single day) at the location of the WD-1 well (*i.e.*, injection water) and obtain a chemical analysis that will be filed with CalGEM; 2) when injection recommences and when sufficient water is available, Trio will run a step-rate test (note: such step-rate-test can be accomplished in a single day) at the WD-1 well, and; 3) that CalGEM stipulates that the WD-1 well with its current mechanical completion may only accommodate an additional 858,000 barrels of water injection. There is nothing abnormal about this process at all and it is standard for restarting an idled well.

12. As further confirmed in the Zoom meeting with CalGEM's Jon Iverson, I understand that the UIC Cyclic-Steam Project #44800005, which enables cyclic-steam injection into the Lombardi oil sands at six existing oil wells at Hangman Hollow, is fully-approved and in good standing. The six oil wells are classified by CalGEM as "idle". Because the six wells are considered idle, Trio will need to notify CalGEM in advance of Trio's intent to reinitiate cyclic-steam injection into any of those wells and CalGEM will probably reply to the notification,

according to Jon Iverson, by advising that routine mechanical integrity tests are required at said wells prior to reinitiating injection, other than at the 35X-23 well where Trio already recently successfully accomplished a mechanical integrity test. The entire process, from the date of the notification from Trio to CalGEM, to the date that cyclic-steam injection may be reinitiated, can probably be accomplished in a matter of weeks (*e.g.*, maybe 2 or 3 weeks). There is nothing abnormal about this process either.

13. My further understanding from the Zoom meeting with CalGEM's Jon Iverson is that it is not urgent but it would be good if Trio in the near future could load to CalGEM's WellStar Website updated reports (*i.e.*, the so-called Project Approval Letter and/or "PAL" reports) for Hangman Hollow's two UIC Projects #64406013 and #44800005.

14. To recap, it is my understanding that Trio may restart oil production at any time (*e.g.*, producing one or more wells "cold", without steam) and within a matter of weeks (*e.g.*, maybe 2 or 3 weeks) would probably have authorization from CalGEM to resume water disposal into the WD-1 well and cyclic-steam injection into selected wells: assuming that the mechanical integrity tests are acceptable in the selected wells (note: as discussed above, that mechanical integrity tests were already recently successfully completed at the WD-1 water disposal well and at the 35X-23 oil well). The regulatory processes with CalGEM reviewed above may be handled in a matter of weeks and in this regard that Hangman Hollow could be producing oil, injecting steam and disposing of produced water by injection also in a matter of weeks from the date that operations are restarted. However, aside from the aforementioned regulatory processes that may be handled in a matter of weeks and from a practical operational standpoint, I understand that additional time may be required for Trio to get funding in place, make tests and repairs to facilities and get the oilfield up and running as it has been idle since November, 2018.

15.     The bottom line is that from a regulatory perspective, getting the oilfield operating is not really an issue. There are no immediate problems with the permit to dispose of produced water and/or with the permit to cyclically inject steam that would prevent the quick restart of operations at Hangman Hollow.

16.     Importantly, Trio did receive recent notices from CalGEM advising that under CalGEM's Testing and Compliance Work Plan (TCWP) requirements of the California Code of Regulations, Trio needed to test, partially plug, or plug and abandon, a certain percentage of some of the wells that Trio operates at different oilfields, including as candidates for such work some of the wells at Hangman Hollow. Trio has fully satisfied the TCWP requirements of these recent notices, which at Hangman Hollow, as discussed above, included mechanical integrity ("MIT") tests, also commonly referred to as "tag and test", at the 35X-23 oil well and at the WD-1 water disposal well. This testing was successfully accomplished, with both wells successfully passing the MITs.

17.     Even without steam, Hangman Hollow could be restarted initially by producing some wells "cold" (*i.e.*, without cyclic-steam injection), in which case cyclic-steam injection probably would not occur in the opened wells for several months or longer. Some of the existing wells initially produced "cold" oil at reasonably good rates and there is reasonable expectation that these wells will do so again.

18.     As an aside, the Scholefield Declaration states that the Chapter 7 Trustee's brokers' 2021 marketing materials provide that "*Temblor recently received aquifer exemption to enable steam flood injection*" (Scholefield Decl., ¶12). A comment in 2021 that "*Temblor recently received aquifer exemption to enable steam flood injection*" would have been incorrect because the Aquifer Exemption was not received by Temblor Petroleum Company, LLC ("Temblor" or the "Debtor"), per se, and because the approval was for cyclic-steam injection and not for steam-flood

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

injection. This incorrect statement would not have materially underrepresented or overrepresented the value of the property because the two key points, which are that both Aquifer Exemption and steam injection are approved, were adequately conveyed.

19. **Additional Misrepresentations in the Scholefield Decl.** Other inaccuracies to the Scholefield Declaration are as follows where he states:

    a. *"I also learned that the materials prepared by the Brokers were inaccurate and misleading. The representation that the Project was idled "pending final approval of the steam injection permit" is inaccurate. The Project was idled because of an expensive, time-consuming permit updating and approval process involving the critical new water disposal well "WD-2" application"* (Scholefield Decl., ¶14). As a working-interest holder in Hangman Hollow, Genautica plainly knew this was not correct as of late 2019. The field was idled because some of the working-interest owners, like Genautica and the Debtor, were in arrears in payments to Trio and, consequently, funding was inadequate to restart the field. Mr. Scholefield is also incorrect in his assertion that the project was idled due to the application for the WD-2 water disposal well. My understanding is that Trio no-longer plans to drill the WD-2 well and is no-longer seeking a permit for the WD-2 well. A permit for the WD-2 well is not needed at all and is not needed prior to restarting the field.

    b. *"With regard to the steam injection permit specifically referenced in the 2021 Marketing Materials, while it is true in that in 2019 Trio obtained a steam injection permit, as indicated in an email dated September 13, 2022 from Pitta to the Trustee, in 2021, CalGEM provided written notice to Trio that the Project would need to undergo Project Approval Letter ("PAL") review. Thus, the injection permit was no longer current. In other words, the representation in the marketing materials that the Project was idled pending final review of the injection permit was incorrect, the steam injection and/or water disposal permit needed to be*

*brought current*" (Scholefield Decl., ¶15). As discussed above, updates and reviews are commonly and routinely requested by CalGEM, typically annually, for most if not all approved UIC projects, including the two approved UIC projects at Hangman Hollow, but this update/review process does not in any way impede and/or constrain Trio's ability to recommence operations at Hangman Hollow, including cyclic-steam injection, oil/gas production, storage and/or water disposal. While it is true that Trio received two notices dated April 21, 2021, from CalGEM, referring to the two approved UIC Projects at Hangman Hollow, stating among other things "In light of recent changes to applicable regulatory requirements for underground injection projects, including various elements of required supporting data, CalGEM believes it will be necessary for you to provide a complete updated package of supporting data for the above-identified project" and to schedule a meeting to "discuss in more detail expectations regarding this project data update, including a timeline for when the update will be completed," on April 19, 2021, two days prior to the CalGEM notices, Trio submitted to CalGEM a sixty-one page updated report entitled "UIC-#64406013-ProjectReportAndApplic.HH-2-RD1-WD_041921" with two Appendixes (i.e., Appendix-A_CasingDiagrams_041921 and Appendix-B_ChemicalAnalysisOfProducedWater_041921), which largely satisfied CalGEM's request for an updated report on this UIC project. And from Trio's Zoom meeting with CalGEM's Jon Iverson, CalGEM emphasized it was not urgent but that it would be good if Trio in the near future could load to CalGEM's WellStar Website updated reports for Hangman Hollow's two UIC Projects #64406013 and #44800005, and that further updates to the reports for these two UIC Projects are not urgent, in part, because both are considered "fairly new" by CalGEM.

   c. *"The representations in the marketing materials regarding the Debtor having received necessary aquifer exempt UIC permits are also incorrect. I only recently learned the Project has been "on hold" by CalGEM since 2018 because the existing water disposal well is*

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

*insufficient for the Project as planned. In order to secure the approvals and permits required to proceed, an updated project approval application must be submitted for approval and permitting to various governmental oversight agencies, none of which has happened nor is it certain to happen*" (Scholefield Decl., ¶17). The three sentences quoted above are full of misleading and confusing misinformation and incorrect statements. The EPA has deemed as Aquifer Exempt at Hangman Hollow the Santa Margarita Sand, 'D' Sand and Lombardi oil sands. To the best of my knowledge and understanding, the aquifer exempt status of these sands at Hangman Hollow has not been challenged by any "governmental oversight agencies." To the best of my understanding, knowledge and recollection, the UIC Water-Disposal Project at Hangman Hollow, which was approved in May, 2013, has never since been "on hold."

    d. "*Trio, as Operator, is the entity that failed to obtain the necessary permits to let the Project proceed. Trio never informed Genautica, nor was Genautica informed by the Brokers or Trustee, that CalGEM put the water disposal well application on hold together with the entire PAL, or of any of the other challenges facing the Project, all of which was concealed by Trio*" (Scholefield Decl., ¶29). Trio, as the operator, successfully obtained the permits that are necessary for production at Hangman Hollow to proceed, including permits for water disposal and cyclic-steam injection. I am not aware of CalGEM ever putting the "water well application" on hold, and nor has CalGEM put the "entire PAL" (whatever that means) on hold.

    e. "*Additionally, I was recently informed that Trio instructed CalGEM to put the Project on the backburner and reassign its project review engineer to Trio's unrelated South Salinas prospect*" (Scholefield Decl., ¶29).  This is entirely false. Neither I, and to my knowledge, nor anyone at Trio advised CalGEM to put the Hangman Hollow project on the back burner and/or to reassign a CalGEM engineer to another of Trio's projects.  In my experience, a regulator like CalGEM, which is a division of the California Department of Conservation, would not take

instructions from Trio on how CalGEM should use its people, and CalGEM does not take any such instructions from Trio or anyone else for that matter regarding how to staff a project and what to review and when. Nor, based on my experience with Trio, would Trio try to do so.

20. As of the date signed, I believe the facts in this declaration are accurate. I will endeavor to supplement this declaration before the hearing, if anything else comes to light to present as accurate of a picture to the Court as possible.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and if called as a witness I could and would testify competently thereto.

Signed on May 31, 2023, at Denver, Colorado.

_____
Terence B. Eschner